[S. F. No. 19722. In Bank. June 27, 1958.]

COMMERCIAL COMMUNICATIONS, INC. (a Corporation) et al., Petitioners, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Real Party in Interest.

[S. F. No. 19723. In Bank. June 27, 1958.]

WATSON COMMUNICATIONS SYSTEMS, INC. (a Corporation) et al., Petitioners, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Real Party in Interest.

[S. F. No. 19725. In Bank. June 27, 1958.]

THE CITY OF LOS ANGELES, Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation), Real Party in Interest.

514

McClean, Salisbury, Petty & McClean, Robert S. McClean, John E. Scheifly, Edward M. Berol, Bruce R. Geernaert, Berol & Silver, Robert N. Lowry, Brobeck, Phleger & Harrison, Gerald H. Trautman, Brent M. Abel, Thomas B. McGuire, McCutchen, Thomas, Matthew, Griffiths & Greene, Jerome Preston, Jr., Lawrence A. Sullivan, Foley, Hoag & Eliot, Roger Arnebergh, City Attorney (Los Angeles), and Alan G. Campbell, Assistant City Attorney, for Petitioners.

Joseph E. Keller, Dow, Lohnes & Albertson, John E. Scheifly, McClean, Salisbury, Petty & McClean, Brobeck, Phleger & Harrison, Robert N. Lowry, Francis L. Cross and Cross & Brandt as Amici Curiae on behalf of Petitioners.

Everett C. McKeage, Roderick B. Cassidy, Hugh N. Orr, Boris H. Lakusta and H. J. McCarthy for Respondent.

Pillsbury, Madison & Sutro, Arthur T. George, Eugene M. Prince, Francis N. Marshall, Dudley A. Zinke and G. H. Eckhardt, Jr., for Real Party in Interest.

SHENK, J.—This is a consolidated proceeding to review an order of the Public Utilities Commission accepting, with modifications and directions, tariff schedule Number 108-T filed by Pacific Telephone and Telegraph Company, hereinafter called Pacific. The schedule was voluntarily filed and covered the installing, leasing and maintaining of private mobile communications systems. The tariff was originally accepted to become effective April 30, 1956, but at the request of petitioners a rehearing was granted and the commission conducted an investigation into the proposed rates and conditions and an inquiry as to the scope of its own jurisdiction. The petitioners, with the exception of the city of Los Angeles, are private persons or firms engaged in furnishing similar service on a private contract basis, in competition with Pacific, which heretofore has offered this service only on a contract basis. The city of Los Angeles has appeared on behalf of customer interests of its own and its inhabitants, and pursuant to its public-spirited interest in utility regulation and growth. The petitioners[1] urge that the commission has incorrectly determined in favor of its own jurisdiction in this matter and contend that their rights under the Constitution of the United States and of this state are violated. They also urge that the tariff creates a conflict with federal law and with the provisions of a consent decree[2] to which Pacific, as a subsidiary of American Telephone and Telegraph Company, was a party.

As a basis for its order the commission found and concluded: 1. That Pacific is a telephone corporation and a public utility in the performance of this service; 2. That the private mobile communication systems and service heretofore furnished under contract by Pacific and proposed in this tariff schedule constitute a telephone line and public utility telephone service, under the provisions of the Constitution and the Public Utilities Code, and that Pacific has dedicated the same to the

[1]Petitioner Thomas Poor, an individual doing business as Bakersfield Electronics, appears as one of the petitioners on the Watson Communication System, Inc. brief. He did not petition for a rehearing before the commission, and therefore has no standing before this court as a petitioner for review. (Pub. Util. Code, § 1731.)

Petitioner Gamewell Company did not petition for rehearing and likewise has no standing to petition for review. This court gave it permission to file a brief, without opposition from the commission until after the brief was filed. It is not necessary to rule on the commission's motion to strike this brief as it may be treated as an amicus curiae brief.

Amici curiae briefs have also been filed by several interested parties.

[2]*United States of America* v. *Western Elec. Co., Inc.,* and *American T. & T. Co. et al.,* Civil Action No. 17-49, U.S.D.C., N.J., Jan. 29, 1956.

public; 3. That the equipment so used is necessary or useful in Pacific's performance of its duties to the public and the leasing thereof is subject to commission jurisdiction as provided in section 851 of the Public Utilities Code[3]; 4. That the commission under sections 455, 728 and 729 has the power to establish rates for these systems in lieu of contracts; 5. That the commission under section 455 has the power to accept, alter or permanently suspend the proposed rates or to establish other rates which it finds to be just and reasonable; 6. That the proposed rates, with the revisions and supplementations ordered, are just and reasonable.

█ Pacific is a private corporation engaged in the public utility telephone business within this state. As such its services, property and charges are subject to the recognized supervision of the commission. █ However, under its charter Pacific may also engage in activities of a non-utility nature. Whether these activities unduly interfere with or hamper it in the performance of its public utility obligations or affect property owned by it which is necessary or useful in the performance of its obligations to the public, are of course, generally, questions within the cognizance of the commission (§§ 701, 702, 851). █ It is sometimes a question of mixed law and fact as to whether a particular activity is within the regulatory scope of the commission. Here we must look to the nature of the activity furnished under this tariff schedule as well as the question of dedication, to determine the jurisdictional issues presented.

Private mobile communication systems, as the name implies, afford direct oral communication with persons in moving vehicles. Tariff 108-T defines "private mobile communication systems" as "one or more land stations and one or more mobile stations, or two or more mobile stations, together with associated equipment, for radiotelephone communication between land and mobile stations or between mobile stations." It defines a land station as an "operational fixed radiotelephone station used with a private mobile communication system as a base station" or as a repeater, control or relay station. █ A mobile station is comprised of "a transmitter, a receiver (with loudspeaker), a push-to-talk handset or microphone, and an antenna." Because it involves the use of radio, there must be compliance with the requirements of the Federal Communications Commission and the provisions of the Federal

---

[3]Unless otherwise indicated all references hereafter are to the Public Utilities Code.

Communications Act (Comm. Act of 1934, 48 Stat. 1064, 47 U.S.C., § 151 et seq. as amended). The person, firm or corporation desiring to have a private mobile communication system must apply to the federal commission for allocation of a radio wave length and for permission to operate the required equipment. ■ The conditions for a license vary with the purpose for which the use is desired, and the system is licensed to be operated for that specific use only. The equipment may be manufactured, purchased or leased by the licensee but he must satisfy the commission that it meets its operating requirements. He may install, maintain and repair the equipment himself or he may delegate these duties but he must remain in control of the equipment. He is subject to punishment by the federal commission for violation of its regulations. The tariff of Pacific complies with the regulations of the federal commission.

Private mobile communication systems differ in some respects from public mobile communication systems. Pacific, as a common carrier telephone company, is licensed by the federal commission to operate public systems over the radio frequencies allocated for this public use. It may install radiotelephone equipment in the vehicle of a subscriber for this use, but all calls must be completed through the company's central office, with the intervention of a company operator to ask for the number and to make the connection. Calls in any number may be made on the company's exchange system throughout the world. This service obviously can only be furnished by a public utility telephone company. It is appropriate and effective for persons needing only occasional communication to or from their vehicles with their offices. It has been furnished by Pacific under tariffs filed with the state commission for the past decade.

Private mobile communication service fulfills a more specialized need. Where a continuously free channel is required, it is more efficacious. After the close of World War II and the Korean conflict government, industry and many organizations began to make extensive use of this type of service for quick, private communication with employees or agents in trucks and automobiles, and there is an ever increasing demand for the service. It is probably most widely known in connection with its use by law enforcement officers and taxicab companies. Pacific entered the field of furnishing private mobile systems in 1948 with two contract customers. In 1954 it was required by the state commission to file copies of its contracts. Sub-

sequently (Order 51446, *Re Southern Counties Gas Co.*, 54 Cal. P.U.C. 75) the commission held that this service would become a public utility service but that there was not then sufficient experience to warrant the filing of tariffs, that this was still an experimental venture and that it might be a dis-service to Pacific's telephone ratepayers to require it at that time to file tariffs and to offer this service to all comers. This decision was not challenged. When Pacific filed tariff sched-ule 108-T in 1956 it had 214 contract customers, covering 1702 private mobile units, and had 225 inquiries on hand for private systems. The 214 contracts represented only 4.5 per cent of the total private mobile base stations then licensed in this state.

The petitioners urge that in furnishing these private sys-tems on a lease-maintenance basis Pacific is merely engaging in an equipment service, not a "telephone service" and they stress the importance of the following differences between pub-lic and private systems: that the private systems have no tie-in or interconnection with the general toll and switching facilities of Pacific; that Pacific cannot furnish the radio channel or the license to operate the equipment but these must be secured by the user; that the user must remain in control of the equipment; that he remains responsible to the federal commission; that the equipment and maintenance may be obtained from many private sources, whereas public mobile communication may be obtained only from a public utility telephone company; that the power for energizing the sending apparatus may be obtained from other sources than a tele-phone company; that for the operation of the private systems there is no dependence upon rights of monopoly, eminent do-main or franchise; that Pacific is merely leasing inert radio equipment; that this service is not available to all of the public, and does not come within the common understanding of a telephone system offering.

Article XII, section 23, of our Constitution provides: "Every private corporation . . . *owning*, operating, managing, *or* controlling any . . . plant, or equipment, *or any part of such . . . plant or equipment within this State . . . for the transmission of telephone . . . messages . . . either directly or indirectly, to or for the public . . . is hereby declared to be a public utility* . . . and every class of private corporations . . . hereafter declared by the Legislature to be public utilities shall likewise be subject to such control and regulation. The . . . Commission shall have . . . such power and jurisdiction

to supervise and regulate public utilities . . . and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature. . . ." (Emphasis added.) In the Public Utilities Code the Legislature has further defined "public utility" as including "every . . . telephone corporation · . . . where the service is performed for or the commodity delivered to the public or any portion thereof" [§ 216, subd. (a)] and has provided that "Whenever any . . . telephone corporation . . . performs a service or delivers a commodity to the public or any portion thereof for which any compensation or payment whatsoever is received, such . . . telephone corporation . . . is a public utility subject to the jurisdiction, control and regulation of the commission and the provisions of this part." [§ 216, subd. (b).] "Telephone corporation" is defined as including "every corporation or person *owning,* controlling, operating, *or managing any telephone line for compensation* within this State" (§ 234); and "telephone line" is defined as including "all . . . property *owned,* controlled, operated, *or managed in connection with or to facilitate communication by telephone, whether such communication is had with or without the use of transmission wires.*" (§ 233.) (Emphasis added.)

█ It is readily apparent that by the use of the disjunctive it was intended that *ownership* of any plant or equipment would be sufficient and that operation and control were not made prerequisites to commission jurisdiction; furthermore that such ownership may be of "any part" of such plant or equipment. It is therefore immaterial that Pacific does not remain in control of the equipment or that it does not furnish the radio channel over which the equipment is operated. These are matters of limitation imposed by the federal commission. The requirement that there be no interconnection with the general toll and switching facilities of Pacific is also imposed by the federal commission and acquiesced in by Pacific, although such connection is physically possible and, in stated cases of public emergency, is permissible.

█ The fact that private mobile communication systems may be obtained from sources other than a public utility, does not detract from the utility nature of this service which is offered to the public under a voluntarily filed tariff. Regulated and nonregulated services compete in many fields[4] and

---

[4] *Story v. Richardson,* 186 Cal. 162 [198 P. 1057, 18 A.L.R. 750] (sale of excess electrical energy by a private person); *Southern Calif. Edison*

there is no requirement in our Constitution or laws that telephone service may be offered only by a monopoly. In some of its phases a telephone company, dedicated to the public service, does tend to become a monopoly (*California Fire Proof Storage Co.* v. *Brundige,* 199 Cal. 185, 189 [248 P. 669, 47 A.L.R. 811]). Were this not so, severe annoyance and economic waste might be caused if telephone users were obliged to subscribe to many competing companies, with duplicate instruments on their desks, and with transmission wires invading the skies or radio telephony cluttering the frequency channels, in order to obtain complete telephone service.

The real issue presented is whether the service offered by the proposed tariff is ''for the transmission of telephone messages'' or ''in connection with and to facilitate communication by telephone.''

The word ''telephone'' is not defined in the code. In its narrow sense ''telephone'' refers to the instrument by which telephony is achieved. It is defined in Webster's New International Dictionary, 2d edition as ''An instrument for reproducing sounds, especially articulate speech, at a distance.'' In defining ''telephony'' the Encyclopaedia Britannica (1954 ed.) states ''In a broad sense the term telephone or telephony includes the entire art of speech transmission with the many accessories and operating methods which research, development and invention have supplied to facilitate and extend conversation at a distance by electrical means.''

As this court pointed out in *Television Transmission, Inc.* v. *Public Utilities Com.,* 47 Cal.2d 82, 88 [301 P.2d 862], in telephony ''one may carry on a two-way communication by speaking as well as by listening'' and it is distinguishable from radio broadcasting in that the latter ''is usually associated with music halls, theaters and newspapers.''

While mobile communication involves an application of the art of radio to telephone communication, it is more akin to telephony than to radio broadcasting.

In determining whether Pacific is here offering a telephone service, it appears to be basic that what a telephone company actually provides and maintains is the facilities for the trans-

---

*Co.* v. *Railroad Com.,* 194 Cal. 757 [230 P. 661] (sale of surplus water by a private person); *Market St. Ry. Co.* v. *Railroad Com.,* 24 Cal.2d 378 [150 P.2d 196], aff'd 324 U.S. 548 [65 S.Ct. 770, 89 L.Ed. 1171] (competing transit service by a municipal utility and a commission-regulated utility); *Samuelson* v. *Public Util. Com.,* 36 Cal.2d 722 [227 P.2d 256] (competing highway contract carriers and highway common carriers).

mission of telephone messages, or for communication by telephone. In its earliest beginnings this transmission was over a single iron wire connecting two telephone instruments with ground return circuits. It was over such a wire that Alexander Graham Bell called to his startled assistant, "Mr. Watson, come here, I want you." That was in March 1876. Many technological improvements in the art of telephony have since been made, including radiotelephony and the instruments used for carrying on conversations at distances greater than the human voice naturally carries. The exact form or shape of the transmitter and the receiver or the medium over which the communication can be effected is not prescribed by law.

In common understanding the communication effected by private mobile systems would appear to be a telephone communication. Section 233 above quoted expressly recognizes that communication may be made without the use of transmission wires. Among the other uses of radio is the transmission of telephone messages without the use of wires. We are informed that today ordinary toll telephone service is furnished as much by radio as by land lines and that Pacific now operates about 350,000 toll circuit miles of microwave radio relay in California. It also uses radio for such diverse services as rural subscriber lines, coastal harbor service and highway service. All of these are treated as public telephone service under filed tariffs. Because of the physical nature of the medium here used (radio), the private nature of the communication contemplated and the restrictions established by the federal commission, private radiotelephone differs in some respects from public radiotelephone service and also from land line telephone service. Nevertheless it is a telephone service and if dedicated to public use it is subject to the jurisdiction of the respondent commission.

The commission found that Pacific has dedicated this service to the public. The fact that only a restricted portion thereof is eligible to apply for it is not determinative. It is offered to all of the public who may be eligible to apply for it. Dedication to a portion of the public will suffice. (§§ 216, 207[5]; *Camp Rincon Resort Co.* v. *Eshleman*, 172 Cal. 561 [158 P. 186].) This service is within a class recognized by the Constitution and the Legislature as a public utility. The

[5]Section 207: " 'Public or any portion thereof' means the public generally, or any limited portion of the public, including a person, private corporation . . . for which the service is performed or to which the commodity is delivered.''

cases cited by petitioners in which dedication constituted the main problem do not present any difficulty.

No jurisdiction over the petitioners or other competitors of Pacific in this field has been asserted by the commission, and in its order it expressly disclaims any intention to assert such jurisdiction until there should be evidence that they had dedicated or were willing to dedicate their service to the public. Until the commission attempts regulation of these petitioners, they have no occasion to complain that they are denied due process of law by the commission's acceptance of Pacific's tariff. (*Stephenson* v. *Binford,* 287 U.S. 251, 277 [53 S.Ct. 181, 77 L.Ed. 288, 87 A.L.R. 721]; *Continental Baking Co.* v. *Woodring,* 286 U.S. 352, 367-369 [52 S.Ct. 595, 76 L.Ed. 1155, 81 A.L.R. 1402]; *Hicklin* v. *Coney,* 290 U.S. 169, 172-173 [54 S.Ct. 142, 78 L.Ed. 247].)

Nor are the petitioners denied equal protection of the law by the fact that a regulated company competes with them in this service. The commission found as a fact that there was no unfair competition by Pacific in this field, and ruled that it would not allow Pacific to give its private mobile customers services which it would not make available to the customers of its competitors and that it would require Pacific to maintain charges which would be fully compensatory. The rates prescribed by the tariff were found, with the modifications ordered, to be fair and reasonable, and as to this the conclusion of the commission on the record presented is binding upon this court.

There is no sound basis for the contention that the regulation of this service is outside the permissible sphere of government regulation and that it contravenes the 14th Amendment. There are several respects in which the private mobile communication systems are of public concern. The evidence shows that these systems are for a considerable part used by public transportation companies, trucking companies, law enforcement agencies, fire departments, and utility companies such as irrigation and water companies. Their purpose is the maintaining of communication with vehicles moving on the public streets and highways. The medium used is radio and is generally of public concern. ". . . [W]here the control is for the public good any industry may be regulated, provided there is 'adequate reason' for it. That 'adequate reason' can only be to achieve a purpose within the police power of the state." (*State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.,* 40 Cal.2d 436, 443 [254 P.2d 29].) The

jurisdiction exerted by the commission over this tariff offering goes merely to the regulation of the telephone service offered by a public utility, a matter concededly within the police power of the state and the powers given to the commission by the Constitution and the Legislature.

 Also in support of its jurisdiction the commission found that the private mobile communication equipment is necessary or useful in Pacific's performance of its duties to the public and the leasing thereof is subject to its jurisdiction, as provided in section 851[6]; that under sections 455, 728 and 729[7] it has the power to establish rates for these systems in lieu of contracts; and that under section 455 it has the power to accept, alter or permanently suspend the proposed rates or to establish other rates which it finds to be just and reasonable. These findings may not be disregarded.

 It is well established that the powers of regulation conferred upon the commission by the Legislature must be cognate and germane to the regulation of public utilities. (*Pacific Tel. & Tel. Co.* v. *Eshleman*, 166 Cal. 640 [137 P. 1119, Ann. Cas. 1915C 822, 50 L.R.A.N.S. 652]; *Morel* v. *Railroad Com.*, 11 Cal.2d 488, 492 [81 P.2d 144].) When these powers relate to telephone companies they must be cognate and germane to the regulation of public utility telephone companies. In this instance the exercise of jurisdiction over this service would seem to be reasonably within the powers so granted to the commission. Its authority to regulate the rates charged by Pacific for this lease-maintenance service sufficiently appears in sections 210,[8] 489[9] and 701.[10]

This leaves for consideration the question of any probable

---

[6]Section 851. "No public utility shall sell, lease . . . any part of its . . . plant . . . or other property necessary or useful in the performance of its duties to the public . . . without first having secured from the commission an order authorizing it so to do. . . ."

[7]Sections 455, 728 and 729 set forth the procedure whereby the commission may investigate the propriety and reasonableness of rates contained in tariffs lawfully filed, and establish new rates.

[8]Section 210: " 'Rates' includes rates, fares, tolls, rentals, and charges, unless the context indicates otherwise."

[9]Section 489: "Under such rules as the commission prescribes, every public utility other than a common carrier shall file . . . schedules showing all rates, tolls, rentals, charges . . . together with all . . . contracts . . . which in any manner affect or relate to rates, tolls, rentals, classifications or service. . . ."

[10]Section 701: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction."

conflict between the jurisdiction of the federal and state commissions and of an alleged limitation on the state commission by reason of the provisions of the New Jersey consent decree hereinbefore referred to.

▉ The respondent commission held that the provisions of section 2, subdivision (b)[11] and section 3, subdivision (e)[12] of the Communications Act of 1934 as amended (47 U.S.C., §§ 152, 153) make it clear that the federal commission has no jurisdiction, except under the radio licensing provisions of the act, over intrastate communication service by radio, and that "interstate communication by radio" does not include communication between points in the same state if such communication is regulated by a state commission. The proposed tariff applies only to service within this state. The commission's ruling would appear to be correct. It is noted that the Federal Communications Commission has not asserted jurisdiction over such tariffs or rates.

In January 1956 the Department of Justice brought a proceeding under the Sherman Act in the United States District Court in New Jersey against Western Electric Company, Inc. and American Telephone and Telegraph Company. By consent of the parties and without trial of the issues a consent decree was entered. Under the federal antitrust laws where no trial is had and no testimony taken, a consent decree is not evidence of or an admission of any of the charges contained in the complaint. (15 U.S.C. 16; *Barnsdall Refining Corp.* v. *Birnamwood Oil Co.* [E.D. Wis. 1940] 32 F.Supp. 308, 310-311.) The New Jersey court specifically retained continuing jurisdiction to issue orders and directions with reference to the construction or enforcement of this final judgment. From the briefs submitted in the proceeding before this court it appears that the original parties to the New Jersey proceeding take opposing views as to the meaning and effect of

---

[11]Section 2, subdivision (b) [47 U.S.C. 152, subdivision (b)], which provides in part as follows: "Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply or give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier. . . ."

[12]Section 3, subdivision (e) [47 U.S.C. 153, subdivision (e)], which provides: " 'Interstate communication' . . . means communication . . . (1) from any State . . . to any other State . . . but shall not, with respect to the provisions of subchapter II of this chapter, include wire or radio communication between points in the same State . . . if such communication is regulated by a State commission."

(Note: Subchapter II is entitled "Common Carriers.")

subdivision (d) of section V of that decree which provides as follows:

"The defendant AT&T is enjoined and restrained from engaging, either directly, or indirectly through its subsidiaries . . . in any business other than the furnishing of common carrier communications services; provided, however, that this Section V shall not apply . . . (d) for a period of five (5) years from the date of this Final Judgment, leasing and maintaining facilities for private communications systems, the charges for which are not subject to public regulation, to persons who are lessees from defendants or their subsidiaries of such systems forty-five (45) days after the date of this Final Judgment. . . ."

The Department of Justice takes the view that under subdivision (d) the defendants in that action were prohibited from engaging in the business of leasing and maintaining facilities for private mobile communications systems, but were allowed a cut-off period of five years for serving those who were lessees within 45 days after the date of the judgment. Its view is that the phrase in subdivision (d) reading "the charges for which are not subject to public regulation" is descriptive of the fact stated, namely, that such charges *are not subject to public regulation*. The other parties to the consent decree are of the view that this phrase merely provides that if the charges are regulated by a state commission the telephone companies are not prohibited by the decree from continuing to furnish equipment and facilities for private mobile communications systems. Pacific, as hereinabove stated, was a party to that decree and would be bound by its terms.

Insofar as we are advised no ruling has been obtained from the New Jersey federal court as to the meaning and effect of subdivision (d) of section V, and no adjudication of this issue has been made by the Federal Communications Commission. However, it has been brought to our attention that in a Memorandum Opinion and Order released November 21, 1957, in the proceedings entitled "In the Matter of American Telephone and Telegraph Company, et al., Lease and maintenance of equipment and facilities for private communication systems, Docket No. 11972," in which this issue was sought to be raised, the federal commission stated it had been unable to find any basis in the specific language of the consent decree to support the contention of the Department of Justice that it

was the intent of that decree to prohibit the service, regulated or unregulated. That commission made no actual determination on this question.

In the proceedings before the state commission some of the petitioners argued that Pacific's motive in filing the proposed tariff 108-T was to avoid the consent decree. The commission held that there was no proof to that effect; that it would not take judicial notice of good or bad intentions; that if the federal court wished to bar such activities by Pacific even though subject to regulation, it would have made such a provision, and that there was nothing in the decree to prompt it to change its ruling that this service was utility service subject to its jurisdiction. No good reason appears why the decision of the commission in this respect should be disturbed.

The order is affirmed.

Gibson, C. J., Traynor, J., and Spence, J., concurred.

SCHAUER, J., Dissenting.—If we follow established law, or even the fundamental principles of our governmental plan, we should hold that the Public Utilities Commission is without jurisdiction in this matter because it clearly appears that the private mobile radiotelephone operations of the Pacific Telephone Company are not public utility operations. Pacific, by its purported dedication of its private mobile radiotelephone equipment and maintenance service and its filing of a tariff schedule, cannot impart the character of a true public utility into that which is essentially a highly competitive private enterprise. The action of the commission, in the premises, gives official approval to the unwarranted invasion of a free market by the entering wedge of what appears to be a design for eventual monopolistic sequestration of the field. This public utility company should not be allowed to convert the furnishing of equipment and maintenance service for private communications into an operation under control of the Public Utilities Commission.

The conditions of the furnishing of equipment and facilities by Pacific are described as follows in Schedule 108-T, filed by Pacific with the Public Utilities Commission. The lessee-licensee is "responsible for securing from the Federal Communications Commission the necessary authorizations for the communications system and the operating personnel as may

be required in accordance with the Rules and Regulations of the Federal Communications Commission.''

''The station licensee shall have exclusive control of the communication facilities furnished to such licensee and full responsibility for their use and operation in accordance with the station authorization and the Rules and Regulations of the Federal Communications Commission.

''The station licensee shall have unlimited right of ingress to and egress from any premises of the Telephone Company on which is located land radio station equipment furnished to each licensee under this schedule, and the licensee shall have unrestricted access to such equipment.''

The lessee must provide and maintain an adequate power supply for each mobile station and, unless the land station is located on premises of Pacific, must provide and maintain an adequate power supply for the land station.

Pacific undertakes only to furnish, install, and maintain the facilities for communication.

The foregoing description by Pacific of the private mobile communication operation shows that the operation is essentially a private business, not a public utility service. The lessee, not Pacific, must secure the requisite authorization for radio operation from the Federal Communications Commission. The lessee has full responsibility for the operation and exclusive control over the communication facilities. The lessee provides the power for operation of the station (except in the few and entirely distinct situations of land stations on telephone company property). Thus it is the lessee who operates and controls the communication service; Pacific merely invades the field of private enterprise to furnish and maintain equipment necessary or convenient to the carrying on of the private communications.

There is nothing in the nature of the private mobile communications business which contemplates that the supplier of the communications equipment retain an interest in it, as Pacific does; most private manufacturers of such equipment sell the equipment to those who operate it. The many thousands of such privately owned items of equipment installed and maintained in aircraft are subject to regulations of both the Federal Communications Commission and the Civil Aeronautics Administration. To what extent the Public Utilities Commission of California expects to overlap the jurisdiction of the federal regulatory bodies is not precisely defined.

According to the majority's construction of the applicable

provisions of the state Constitution[1] and the Public Utilities Code,[2] the Constitution has authorized the Legislature to provide, and the Legislature has provided, that any service in connection with any telephonic communication, public or private, is a public utility service subject to the jurisdiction of the Public Utilities Commission if it is offered to the public or any portion thereof. But the Constitution should not lightly be understood as authorizing the Legislature to convert private business into a public utility and the legislation enacted pursuant to the Constitution should not be understood as intended so to do.

Private mobile radiotelephone communication systems are analogous to private interoffice or intrabuilding communication systems. Concerning the latter type of communication system the following language and holding of *Chesapeake & Potomac Tel. Co.* v. *Manning* (1902), 186 U.S. 238, 246-247 [22 S.Ct. 881, 46 L.Ed. 1144], are pertinent: "it cannot be presumed that a legislature intends any interference with purely private business. It cannot ordinarily prescribe what

---

[1]Cal. Const., art. XII, § 23: "Every private corporation . . . owning . . . equipment . . . for the transmission of telephone . . . messages . . . , either directly or indirectly, to or for the public . . . is hereby declared to be a public utility subject to such control and regulation by the . . . Commission as may be provided by the Legislature . . . The . . . Commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the Legislature, and every class of private corporations, individuals, or associations of individuals hereafter declared by the Legislature to be public utilities shall likewise be subject to such control and regulation. . . ."

[2]Pub. Util. Code, § 216: " (a) 'Public utility' includes every . . . telephone corporation . . . where the service is performed for or the commodity delivered to the public or any portion thereof.

" (b) Whenever any . . . telephone corporation . . . performs a service or delivers a commodity to the public or any portion thereof for which any compensation or payment whatsoever is received, such . . . telephone corporation . . . is a public utility subject to the jurisdiction, control and regulation of the commission. . . ."

Pub. Util. Code, § 207: " 'Public or any portion thereof' means the public generally, or any limited portion of the public, including a person, [or] private corporation . . . for which the service is performed or to which the commodity is delivered."

Pub. Util. Code, § 233: " 'Telephone line' includes all conduits, ducts, poles, wires, cables, instruments, and appliances, and all other real estate, fixtures, and personal property owned, controlled, operated, or managed in connection with or to facilitate communication by telephone, whether such communication is had with or without the use of transmission wires."

Pub. Util. Code, § 234: " 'Telephone corporation' includes every corporation or person owning, controlling, operating, or managing any telephone line for compensation within this State."

an individual or corporation, engaged in a purely private business, shall charge for services, and, therefore, although the language of a statute may be broad enough to include such private business, it will generally be excepted therefrom in order to remove all doubts of the validity of the legislation. It appears that some portion of the defendant's business is of a purely private nature, the receipts whereof are spoken of in its reports as private rentals, and as to such business Congress could not, if it would, prescribe what shall be charged therefor. In many buildings, both those belonging to the government or the District [of Columbia], and those belonging to private individuals, is what may be called a local telephone plant; that is, an arrangement of telephones by which parties in different rooms can communicate with each other; a system which is not connected with the general telephone exchange, and is no more public in its nature than the speaking tubes or call bells in a building. It is only for the personal use of parties in the building. By it those in the building cannot communicate with the general public, nor can such public reach parties in the building. It is simply a local convenience for the use solely of those who are in the building. Such combinations of telephone instruments in a single building, with no outside connections, are furnished by the defendant, and the rentals therefrom, as well as the expenses thereof, are entered in its books of account, and constitute a part of its business.'' The described system, it is held, was not subject to rate regulation by Congress. (See also *City of St. Paul* v. *Tri-State Tel. & Tel. Co.* (1935), 193 Minn. 484 [284 N.W. 822] [telephone systems, separate from the general public telephone system, for city's fire and police departments are ''a private use''].)

Contrary to the majority opinion (p. 524) it has been held that the fact that a private telephone system may be used by a governmental unit for governmental purposes does not make the system a public utility subject to regulation as such. (*Chesapeake & Potomac Tel. Co.* v. *Manning* (1902), *supra*, 186 U.S. 238, 247; *City of St. Paul* v. *Tri-State Tel. & Tel. Co.* (1935), *supra*, 193 Minn. 484, 486 [258 N.W. 822, 824].)

The fact that equipment for private mobile communications systems is furnished and maintained by a public utility corporation which also furnishes public utility facilities and service, does not mean that the corporation, as to the private service, can be compelled to file a tariff with the Public

Utilities Commission or is entitled to have a tariff accepted by the commission. ''The mere fact that such telephones are furnished by the company, which also does a public business, does not make them a part of such public business, or subject them to the regulation by Congress of its charges. A railroad company may, if authorized by its charter, carry on not simply its strictly railroad business, but also an establishment for the manufacture of cars and locomotives. The fact that it is engaged in these two different works would not in itself subject the manufacture of cars and locomotives to the supervision of the legislature, although such body would have the right to regulate the charges for railroad transportation.'' (*Chesapeake & Potomac Tel. Co.* v. *Manning* (1902), *supra,* 186 U.S. 238, 247; see *Allen* v. *Railroad Com.* (1918), 179 Cal. 68, 82 [175 P. 466, 8 A.L.R. 249].)

The fact that Pacific has offered, by filing Schedule 108-T, to submit to the jurisdiction of the commission and to furnish communication equipment on a lease and maintenance basis without discrimination to persons authorized by the Federal Communications Commission to operate private mobile communications systems, cannot convert an essentially private business operation into a public utility offering. (See *Allen* v. *Railroad Com.* (1918), *supra,* 179 Cal. 68, 82.)

The opinion of the commission states, ''We are not convinced that Pacific's presence in the field will constitute any threat to the continued vigor of its competitors. It should not, does not propose to, and will not be allowed to favor its own private mobile customers by way of connections with its 'land lines' not allowed to the customers of its competitors. It will be required to maintain charges which are fully compensatory. It will be under the disadvantage of being unable to enter into price competition with its competitors to secure the business of particularly desirable customers; and it will be required to serve customers its competitors may not elect to serve. . . .

''The Commission finds that competition of regulated companies with the nonregulated, if it is unfair at all, is more likely to be unfair to the regulated rather than to the nonregulated competitors. . . . [I]n the Commission's opinion, the public has less to fear from the activities of a 'monopoly' when such 'monopoly' is fully regulated by public authorities and we fail to find that Pacific will be in a position to compete unfairly with its smaller rivals.''

These determinations of the commission ignore the realities of the situation. Pacific, a public utility corporation, obviously

is looking toward expanding the area of its operations into a field now serviced by private enterprise. Surely the commission is not presuming that Pacific is altruistic in filing schedules for its activities in this field. And certainly Pacific has the right to seek expansion, diversification, and increased profits—but not by the process of bringing disparate segments of private enterprise into its monopolistic domain. Of course it is true that Pacific currently, under free enterprise conditions, is far from having a monopoly in this field. But manifestly it is working toward elimination of the competition of private persons and firms in the newly invaded field of private mobile communication service. The result of the majority decision upholding the order of the commission will be a tendency to promote monopoly in a field of business operation which is and should remain in the realm of free enterprise. The decision of the majority places the stamp of approval upon bureaucratic recognition, as well as control, of Pacific in a type of business which has not been shown to require regulation as a monopoly. The private mobile communication business has heretofore operated satisfactorily under the freely competitive conditions which have characterized it. Understandably the petitioners engaged in this business in the open market of free enterprise object to commission action which amounts to bureaucratic sponsorship of a public utility corporation operating as a public utility in this field.

The following discussion in *General Alarm, Inc.* v. *Underdown* (1953), 76 Ariz. 235 [262 P.2d 671, 672-673 [1-3]], concerning a telephonic and telegraphic burglary, fire, and emergency alarm system is apropos: "To be a public service corporation, its business and activities must be such as to make its rates, charges, and methods of operation a matter of public concern. It must be, as the courts express it, clothed with a public interest to the extent clearly contemplated by the law which subjects it to governmental control. Free enterprise and competition is the general rule. Governmental control and legalized monopolies are the exception and are authorized under our constitution only for that class of business that might be characterized as a public service enterprise. The theory is that the right to public regulation and protection outweighs the customary right of competition. If the public contact with a business is such that its necessities and convenience can be better served through governmental supervision and controlled monopoly, thereby eliminating cus-

tomary competition, the state may exercise its police power to that end. Such invasion of private right cannot be allowed by implication or strained construction. It was never contemplated that the definition of public service corporations as defined by our constitution be so elastic as to fan out and include businesses in which the public might be incidentally interested or businesses that might incidentally transmit messages in furtherance of the main object of the enterprise that otherwise could not be so characterized. The public has some interest in all business establishments but that interest must be of such a nature that competition might lead to abuses detrimental to the public interest. The public interest contemplated depends on the nature of the business, the means by which it touches the public, and the abuses which may reasonably be anticipated if not controlled. *Charles Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U.S. 522 [43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280]. Our constitution must and easily can be interpreted in harmony with these principles. So construed, it is only in the interest of the convenience and necessity of the public, of the nature and to the degree herein stated, that a business may be supervised and controlled, rates fixed or monopolies granted.''

With reference to the provision of the 1956 consent decree of the United States District Court for the District of New Jersey in *United States* v. *Western Electric Co.,* quoted in the majority opinion, *ante,* p. 527,[3] I would comment as follows: This provision is not a clear declaration that the charges for leasing and maintaining private communications systems are not subject to public regulation; neither is it a clear declaration that American Telephone and Telegraph Company and its subsidiaries are not enjoined from engaging in the business of leasing and maintaining facilities for private communications systems where the charges for those private communications services are subject to public regulation. In the circumstances it does not appear that the provision of the consent decree should influence the decision herein.

---

[3]''The defendant AT&T is enjoined and restrained from engaging, either directly, or indirectly through its subsidiaries . . . in any business other than the furnishing of common carrier communications services; provided, however, that this Section V shall not apply . . . (d) for a period of five (5) years from the date of this Final Judgment, leasing and maintaining facilities for private communications systems, the charges for which are not subject to public regulation, to persons who are lessees from defendants or their subsidiaries of such systems forty-five (45) days after the date of this Final Judgment. . . .''

For the reasons above stated I would annul the order of the Public Utilities Commission.

Carter, J., and McComb, J., concurred.

Petitioners' application for a rehearing was denied July 23, 1958. Carter, J., Schauer, J., and McComb, J., were of the opinion that the petition should be granted.

