[S. F. No. 20145. In Bank. May 24, 1960.]

PAJARO VALLEY COLD STORAGE COMPANY (a Corporation), Petitioner, v. PUBLIC UTILITIES COMMISSION, Respondent.

Wyckoff, Parker, Boyle & Pope, Philip T. Boyle and Harry F. Brauer for Petitioner.

William M. Bennett, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, J. Thomason Phelps, Principal Counsel, and Hector Anninos, Associate Counsel, for Respondent.

McCOMB, J.—Petitioner seeks to obtain an annulment of an order of the Public Utilities Commission pursuant to the provisions of section 1756 of the Public Utilities Code.*

The commission on its own motion on April 1, 1958, ordered an investigation into the operations of petitioner (hereinafter termed "the company"), and after a hearing found that the company was a public utility, specifically a warehouseman, as defined in section 239 of the Public Utilities Code, and a food warehouseman, as defined in section 2508 of the same code.

---

*Section 1756 of the Public Utilities Code reads: "Within 30 days after the application for a rehearing is denied, or, if the application is granted, then within 30 days after the decision on rehearing, the applicant may apply to the Supreme Court of this State for a writ of certiorari or review for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined. The writ shall be made returnable not later than 30 days after the date of issuance, and shall direct the commission to certify its record in the case to the court. On the return day, the cause shall be heard by the Supreme Court, unless for a good reason shown it is continued."

■ This is the sole question necessary for us to determine: *Was there substantial evidence to sustain the commission's finding that the company was a public utility—a warehouseman, as defined in section 239 of the Public Utilities Code, or a food warehouseman, as defined in section 2508 of the same code?*

This question must be answered in the negative. Section 239 of the Public Utilities Code reads in part thus: "(a) 'Warehouseman' includes . . . (b) Every corporation or person owning, controlling, operating, or managing any building, structure, or warehouse, *in which merchandise,* other than secondhand household goods or effects, and other than liquid petroleum commodities in bulk, and other than merchandise sold but retained in the custody of the vendor, *is regularly stored for the public generally, for compensation,* within this State, except warehouses conducted by any nonprofit, cooperative association or corporation which is engaged in the handling or marketing of the agricultural products of its members and warehouses conducted by the agents, individual or corporate, of such associations or corporations, while acting within the limitations imposed by law on their principals." (Italics added.)

Section 2508 of the Public Utilities Code reads: " 'Food warehouseman' includes every person, or corporation, their lessees, trustees, receivers or trustees appointed by any court whatsoever owning, controlling, operating, or managing any building, structure, warehouse, elevator, or plant *in which food commodities, regularly received from the public generally, are stored for compensation,* including cold storage plants and refrigerating plants, but not including private homes, hotels, restaurants, or exclusively retail establishments, or others not storing articles of food for other persons for compensation. Every person, or corporation controlling, operating, or managing any building, structure, warehouse, elevator, or plant as aforesaid, is deemed to be engaged in the storage of food commodities within the meaning of this chapter." (Italics added.)

It is to be noted that both a warehouseman and a food warehouseman, as defined by the above-quoted sections of the act, are persons or corporations which regularly store or receive commodities or food for compensation from "the public generally."

In the present instance, there was no material conflict in the evidence, which disclosed the following: The company

was originally organized in 1919 as a cooperative under section 653t et seq. of the Civil Code. At first, it had 18 members, all of whom were apple growers in the Watsonville area. The sole purpose of the company was, and its basic purpose still is, to store the apples of its members. Through death and inheritance, the number of members has increased to 27 (most of whom hold fractional memberships), and a number of the present owners are no longer in the apple business. Pursuant to statutory provision (Stats. 1931, ch. 869, p. 1840), the company is now deemed organized under the general corporation law. It operates a warehouse in Watsonville. All of its rooms can accommodate food commodities for cold storage, and about 45 per cent of its space can be converted to accommodate frozen foods.

Each member has a vested right to an aliquot part of the company's storage space. The members pay assessments when needed to defray operating costs of the company. They do not pay anything else for the use of the space and are therefore entitled to cold storage services at cost.

At an annual meeting, the members determine the allocation of cold and frozen space. Primary consideration is given to the anticipated needs of the members for the storage of their apples. Only the excess, if any, is allocated to frozen goods. The allocation varies from year to year. The space allocated to cold storage is divided among the members in accordance with their interests in the company.

Apples start moving into storage the middle of September and are not removed entirely until March 1 of the following year. In the late spring and early summer the company's cold storage facilities are not used. From early August to the middle of September they are rented to Libby, McNeill & Libby for the storage of pears. Except for its contract with Libby, the company has consistently turned down offers to rent that space.

Members who do not need space to store their apples transfer it to other members or nonmembers and receive compensation therefor directly from the transferees.

A certain amount of space must be reserved for aisles and cannot ordinarily be utilized. Occasionally apples are stored in large lots that obviate the need for aisle space. The additional storage space so gained is rented by the company, but only to members or their transferees, and the compensation therefor is paid to the company.

The company also permits certain designated nonmembers (never more than six) to store small quantities of apples as an accommodation to certain members. Compensation for such accommodation storage is paid to the company.

With regard to the space devoted to frozen storage, commodities are received and accepted only from three designated local processors. (Some time in the past there were four such processors, as well as two local warehousemen, whom the company occasionally accommodated by storing their excess.) The company does not receive or accept frozen commodities from anybody else. These three processors frequently sell their goods while in storage. Storage charges are paid by the persons who own the goods. Thus the company has received payment of storage of frozen foods from as many as 20 persons during any one year.

The commission specifically found: ''Under their arrangements with the company these three frozen food processors can transfer commodities in storage to various other parties. . . . It is clear from this that the respondent is holding itself out to store for as many parties as might become transferees from the three food processors.''

The foregoing evidence does not sustain, or provide an inference which sustains, the last quoted finding. There is a total absence of evidence that the company ''holds itself out to those transferees,'' since the uncontradicted testimony was that if any of those transferees wished to deposit goods with the company, they would be refused. The evidence shows that, as a matter of law, a warehouseman merely has a lien on goods for storage charges, but it may not restrain a depositor from selling his goods while they are in storage or from transferring them as security for financing purposes; that the company has no control over the person who pays the storage charges; and that it is impossible and impracticable to compel the original depositor to pay storage charges on goods which no longer belong to him.

The record discloses that the members of the company have an unqualified prior right to the company's facilities for the storage of their apples. The articles of incorporation provide: ''Each membership shall be and represent one vote and one property right and interest.'' The by-laws expressly entitle each member to allocated storage space in the company's warehouse. The members thus have a property right in warehouse space, an interest much greater and more specific than that of an ordinary stockholder in a corporation.

The principal right of the members under the articles is to store apples in a given allocated space. This right has been exercised and zealously guarded by the members since the organization of the company in 1919.

In the event the entire storage space of the company is needed for the members, it will be so allocated, and all frozen products will be removed. In 1954 and 1955, after the construction of facilities for storage of frozen foods, the entire capacity was in fact so allocated.

Since a member has a property right in allocated space, he can dispose of it as he sees fit and can solicit a transferee if he so chooses. The company derives no benefit from a member's solicitation; it has no power to stop him, and his act is not an act of the company nor attributable to it for purposes of determining its manner of operation.

The company has the right to collect a member's delinquent assessment from his transferee, but this does not constitute corporate control over the identity or the number of the transferees. There is no evidence in the record that this right has ever been exercised. The company has the right to object to a transfer only if the transferor-member's assessment is unpaid.

The evidence discloses that the company does not solicit business, but has no power to prevent its members from soliciting transferees of their space, and cannot be held accountable for its members' acts.

The company neither requested nor paid for a listing in the classified section of the telephone directory, as the commission correctly found.

Since the inception of the frozen storage business, the same customers have been served—originally four customers and two warehousemen who were accommodated, now three customers and no accommodation to competitors. Those particular customers were chosen because they were doing business with the members. Libby, McNeill & Libby has been served since 1947. With regard to the transferees from members and the company's storage of small lots as accommodation for friends of the members, there is also substantial identity of persons served year after year. Most of the members' transferees are relatives or business associates of members.

The company likewise has consistently refused to accept for cold or frozen storage potatoes, turkeys, buns, peas, melon balls, apricots, plums, and strawberry crates and plants. All this business would have been profitable and could have been

accommodated without interfering with any of the other business of the company, but it was always rejected.

The uncontradicted evidence discloses that the company had at all times manifested an unequivocal intent not to dedicate its facilities to the public generally, limited the types of products stored, and carefully restricted its customers to the few processors who were in some manner related to its members, either directly or indirectly through their farming operations or family connections.

Mr. Bechis, whose testimony was uncontradicted, graphically illustrated this point when he testified as follows: "No, we have never held ourselves to be public warehousemen. We have never solicited business from the public in general and do not intend to deal with the public in general, because we are restricted in the use of our space by the ultimate demands of our members who built this place to store their stinking apples in and when they want to put their apples in, by God, they're going to put them in there, come hell or high heaven, and therefore we can not go out and do business with the public in general and be forced to dedicate certain rooms for certain purposes, because when they tell me they want to store their apples in that space, I am going to have to clean the house and I am going to have to make room for the apples, and that is why we have restricted our operation as to what has been described here."

To summarize the evidence on the issue of whether or not the company had held itself out to serve the public generally or just selected individuals, it appears without contradiction that the prior property interest of the members in the available storage space was the central fact which determined the company's method of operation; that members have a vested right to an aliquot part of storage space and to storage services at cost; that members have vested rights to transfer their allocated space to other members or nonmembers and to receive compensation therefor; that the needs of members determine the allocation of cold and frozen storage space; that the company exercises no control whatever over the members' disposition of their space; that the company on occasion accepts apples from designated nonmembers as an accommodation to certain members and receives compensation therefor; that the company rents aisle space only to members or to transferees of members; that there is substantial stability in the customers of aisle space and the friends of members accommodated with the storage of small lots of apples; that

during a part of the off-season the company rents all its cold storage space year after year to one designated customer, Libby, McNeill & Libby; that during the remainder of the off-season the space is unused; that the company has turned down offers to rent space to outsiders even though such business would have been profitable and could have been accommodated without interfering with other business of the company; that the company has refused to accept for cold storage any products except apples and pears; that the company has restricted the frozen products stored to those related to the members and their business; and that the company has at no time engaged in any solicitation or intended to dedicate its property to the public generally.

Both the company and the commission agree that the commission did not consider the question of separation in determining the company's status, nor did the commission consider what changes could be made in the company's operation, nor whether or to what degree, if any, such changes might affect the commission's decision. There is consequently no issue on that subject before us.

From the foregoing evidence, it is clear that the company is not a public utility either as a warehouseman, as defined in section 239 of the Public Utilities Code, or as a food warehouseman, as defined in section 2508 of that code.

In view of our conclusions, it is unnecessary to discuss other questions briefed by counsel.

The order of the commission is annulled.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., White, J., and Dooling, J. pro tem.* concurred.

---

*Assigned by Chairman of Judicial Council.