[S. F. Nos. 20302, 20311. In Bank. July 1, 1960.]

RICHFIELD OIL CORPORATION (a Corporation), Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; SOUTHERN COUNTIES GAS COMPANY OF CALIFORNIA (a Corporation), Real Party in Interest.

[Two Cases.]

[S. F. Nos. 20303, 20313. In Bank. July 1, 1960.]

SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent; SOUTHERN COUNTIES GAS COMPANY OF CALIFORNIA (a Corporation), Real Party in Interest.

[Two Cases.]

Mervyn W. Phelan, Ball, Hunt & Hart, Joseph A. Ball, Clark Heggeness, Rollin E. Woodbury, Harry W. Sturges, Jr., Trippet, Yoakum & Ballantyne, Oscar A. Trippet and Thomas H. Carver for Petitioners.

Pillsbury, Madison & Sutro, Turner H. McBaine, O'Melveny & Myers, Pierce Works, Richard C. Bergen, William W. Alsup, Hanna & Morton, Harold C. Morton, David A. Thomas,

Frank B. Belcher, McCutchen, Doyle, Brown & Enersen, William R. Gardner, Stanley & Kirby, and Charles C. Stanley as Amici Curiae on behalf of Petitioners.

William M. Bennett, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, Mary Moran Pajalich, Senior Counsel and J. Calvin Simpson, Assistant Counsel, for Respondent.

Reginald L. Vaughan, William P. Gray, Joseph R. Rensch, Milford Springer and Herman F. Selvin for Real Party in Interest.

Dion R. Holm, City Attorney (San Francisco), Orville I. Wright, Deputy City Attorney, Roger Arnebergh, City Attorney (Los Angeles), Alan G. Campbell, Assistant City Attorney, Jean F. DuPaul, City Attorney (San Diego), Frederick B. Holoboff, Deputy City Attorney, John K. Colwell, City Attorney (Santa Ana), Thomas W. Bewley, City Attorney (Whittier), Charles A. Rummel, General Counsel, California Farm Bureau Federation, William L. Knecht, Chickering & Gregory, Sherman Chickering, C. Hayden Ames, Robert W. Tallman and George A. Malloch as Amici Curiae on behalf of Respondent and Real Party in Interest.

TRAYNOR, J.—In these proceedings Richfield Oil Corporation, an oil and gas producer, and Southern California Edison Company, a public utility electrical corporation, attack two orders of the Public Utilities Commission determining that in respect to its gas operations Richfield is a public utility gas corporation subject to the jurisdiction of the commission and ordering it to cease and desist from delivering gas to Edison's Mandalay steam-electric generating plant.

This controversy arose out of Edison's wish to obtain and Richfield's willingness to deliver a dependable supply of natural gas to be used as boiler fuel for a new steam-electric generating plant at Edison's Mandalay station in Ventura County. That plant is located in the certificated service area of Southern Counties Gas Company, a regulated public utility gas corporation. Southern Counties objects to the invasion of its service area by Richfield. Edison contends, however, that Southern Counties is unwilling or unable to provide the gas service Edison requires and that therefore it is compelled to seek gas elsewhere. It points out that Southern Counties offers it only an interruptible gas supply subject to being shut off when the gas is required for Southern Counties' firm or noninterruptible customers and that Southern Counties will

not commit itself to deliver a fixed volume of gas per year. It asserts that use of fuel oil as an alternative fuel when gas is unavailable is objectionable because of air pollution, and that unless it can count on a given total supply of gas, whether supplied with or without interruption, it cannot arrange for an economical supply of fuel oil to complete its fuel requirements.

Richfield is willing to supply Edison with gas for its Mandalay plant pursuant to a contract it entered into with Edison, but it is not willing to do so as a regulated public utility gas corporation and has therefore refused to apply for a certificate of public convenience and necessity to provide such service and would not accept such a certificate if it were offered to it.

Southern Counties and the commission contend that Richfield's delivery of gas to Edison is subject to the commission's jurisdiction and that since Richfield has refused to seek permission to perform that service pursuant to lawful regulation, the cease and desist order was proper. They contend that to permit a major producer of natural gas to commit a significant fraction of the state's gas reserves to a major consumer without regulation will defeat the public interest. They point out that a public utility gas corporation must secure sufficient gas and build adequate facilities to supply all of its firm customers, predominantly householders, with all of the gas they need on the coldest days. To operate economically such a system must have interruptible customers, such as industrial plants and power plants, that can use gas for fuel when it is not needed by the firm customers, but who can switch to oil when it is. If interruptible customers are permitted to secure firm supplies of gas through unregulated contracts made directly with producers, the balance between firm and interruptible customers of regulated utilities may be destroyed. Moreover, since there is not enough gas to supply all of the needs of all of the consumers who wish to use it, it is contended that the public interest requires that the commission determine how the supply shall be allocated.

There is no need to expand the persuasive arguments of Southern Counties and the commission that the Legislature could constitutionally provide for the regulation of Richfield's service to Edison. It may be assumed that the public interest in such an important natural resource as natural gas would justify under the United States Constitution comprehensive legislation regulating all phases of its production and use. These questions do not arise, however, unless the commission

has been vested by the California Constitution and legislation pursuant thereto with the jurisdiction over Richfield that it asserts.[1]

Richfield contends that the commission has no jurisdiction to regulate it as a public utility gas corporation on the ground that it has not dedicated its property to a public use. It relies upon an unbroken line of decisions from *Thayer* v. *California Development Co.* (1912), 164 Cal. 117 [128 P. 21], to *California Water & Tel. Co.* v. *Public Util. Com.* (1959), 51 Cal.2d 478 [334 P.2d 887], requiring dedication as a prerequisite to public utility regulation, and it contends that the requirement of dedication is implicit in the constitutional and statutory definitions of public utilities as utilities that render services "to or for the public" (Cal. Const., art. XII, § 23) or "to the public or any portion thereof." (Pub. Util. Code, § 216, subd. a; see also *Associated etc. Co.* v. *Railroad Commission*, 176 Cal. 518, 522-523 [162 P. 62, L.R.A. 1918C 849]; *Souza* v. *Public Utilities Com.*, 37 Cal.2d 539, 542-543 [233 P.2d 537].)

Southern Counties contends that dedication of property to a public use is different from service "to or for the public" or "to the public or any portion thereof," and that the requirement of dedication was engrafted onto the statutory provisions by the court to meet constitutional objections under the due process clause of the United States Constitution. Since in its view these constitutional objections did not survive the decision of the United States Supreme Court in *Nebbia* v. *New York*, 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469] (see also *Phillips Petroleum Co.* v. *Wisconsin*, 347 U.S. 672, 677 [74 S.Ct. 794, 98 L.Ed. 1035]; *Federal Power Comm'n* v. *Natural Gas Pipeline Co.*, 315 U.S. 575, 582 [62 S.Ct. 736, 86 L.Ed. 1037]), it contends that the courts should reinterpret the relevant statutes and give effect to the plain meaning of their terms to the extent constitutionally permissible today. (*Cf. Carl F. W. Borgward, G.M.B.H.* v. *Superior Court*, 51 Cal.2d 72, 75 [330 P.2d 789]; *Henry R. Jahn & Son* v. *Superior Court*, 49 Cal.2d 855, 858-859 [323 P.2d 437].)

Subdivision (a) of section 216[2] of the Public Utilities Code

---

[1] It is not contended that the commission's orders were or could have been based on the commission's power to regulate Edison. (See *Pacific Tel. & Tel. Co.* v. *Public Utilities Com.*, 34 Cal.2d 822, 828-830 [215 P.2d 441].)

[2] "§ 216. (a) 'Public utility' includes every common carrier, toll bridge corporation, pipeline corporation, gas corporation, electric corporation, telephone corporation, telegraph corporation, water corporation, wharfinger, warehouseman, and heat corporation, where the service is

provides: " 'Public utility' includes every . . . gas corporation . . . where the service is performed for or the commodity delivered to the public or any portion thereof." Subdivision (b) provides: "Whenever any . . . gas corporation . . . performs a service or delivers a commodity to the public or any portion thereof for which any compensation or payment whatsoever is received, such . . . gas corporation . . . is a public utility subject to the jurisdiction, control, and regulation of the commission and the provisions of this part." Subdivision (c) provides: "When any person or corporation performs any service or delivers any commodity to any person, private corporation, municipality or other political subdivision of the State, which in turn either directly or indirectly, mediately or immediately, performs such service or delivers such commodity to or for the public or some portion thereof, such person or corporation is a public utility subject to the jurisdiction, control, and regulation of the commission and the provisions of this part." Section 222 provides: " 'Gas corporation' includes every corporation or person owning, controlling, operating, or managing any gas plant for compensation within this State, except where gas is made or produced on and distributed by the maker or producer through private property alone solely for his own use or for the use of his tenants and not for sale to others." Section 221 provides: "'Gas plant' includes all real estate, fixtures, and personal property, owned, controlled, operated, or managed in connection with or to facilitate the production, generation, transmission, delivery, or furnishing of gas, natural or manufactured, for light, heat, or power." Sec-

performed for or the commodity delivered to the public or any portion thereof.

"(b) Whenever any common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger, warehouseman, or heat corporation performs a service or delivers a commodity to the public or any portion thereof for which any compensation or payment whatsoever is received, such common carrier, toll bridge corporation, pipeline corporation, gas corporation, electrical corporation, telephone corporation, telegraph corporation, water corporation, wharfinger, warehouseman, or heat corporation, is a public utility subject to the jurisdiction, control, and regulation of the commission and the provisions of this part.

"(c) When any person or corporation performs any service or delivers any commodity to any person, private corporation, municipality or other political subdivision of the State, which in turn either directly or indirectly, mediately or immediately, performs such service or delivers such commodity to or for the public or some portion thereof, such person or corporation is a public utility subject to the jurisdiction, control, and regulation of the commission and the provisions of this part."

tion 207 provides: " 'Public or any portion thereof' means the public generally, or any limited portion of the public, including a person, private corporation, municipality, or other political subdivision of the State, for which the service is performed or to which the commodity is delivered.''

Sections 207 and 216 of the Public Utilities Code were enacted in 1913 in substantially their present form (Stats. 1913, ch. 553, pp. 934, 938) as amendments to section 2 of the Public Utilities Act of 1911 (Stats. ex. sess. 1911, ch. 14, p. 18) following the decision in 1912 of *Thayer* v. *California Development Co.*, 164 Cal. 117 [128 P. 21]. In that case the court held that a member of the public could not demand service from a distributor of water if the distributor had not dedicated its water rights to public use. Although section 1 of article XIV of the Constitution provided that "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law,'' the court rejected the contention that this provision "necessarily creates a public use whenever any water is sold or distributed, regardless of the number of persons to whom it is delivered, the manner or character of the disposition made of it, or of the transfer of the right thereto.'' (164 Cal. at p. 133.) It pointed out that "In *Merrill* v. *Southside Irr. Co.*, 112 Cal. 426 [44 P. 720], it was held that the word 'appropriation,' in section 1 aforesaid, does not refer to the act by which the water is acquired, as the taking from the stream, for example, but to the act or acts by which it is designated, set apart, and devoted to the purposes of sale, rental, or distribution. According to the theory of the plaintiff in this case, whenever the owner of a water supply determines to and does sell it for a price agreed. on between himself and the purchasers, it immediately becomes subject to public use, and any other person to whom it can be conveniently distributed in the same manner would have the right to a proportionate share of the water on the same terms as the purchaser, and, if the supply is limited, the first purchasers must divide with all others who may come in and claim a share. Under that theory, where a person having a surplus of water parts with a portion of it by sales to others he thereby appropriates such portion to purposes of sale and dedicates it to public use. This application of the section would destroy private rights in water and convert every sale thereof into a dedication to public use. We do not believe that the constitu-

tion was intended to have such effect, or that it should be so construed. Article XIV taken as a whole shows plainly that it was intended to regulate the use of water appropriated and dedicated generally for sale and distribution among an indefinite number of users. It could not have been intended to declare that a single sale of a part of his water by one having more than he needs would convert the use into a public use in which others could share. If a single sale could not do this, other sales of like character would not accomplish it. The section must be understood to apply to cases where one has appropriated water generally, for sale, rental, or distribution, and not to cases where sales are made to particular persons at a fixed price by ordinary contracts of purchase and sale.'' (164 Cal. at pp. 134-135.)

If we were called upon to decide the question for the first time in the light of modern principles of constitutional law, we would have serious doubts that the broad language of the amendments to section 2 of the Public Utilities Act should be interpreted as including the limitation of dedication that the court found in the constitutional provision it construed in the Thayer case. ▪▪▪ Although the requirement of service or delivery of any commodity ''to the public or any portion thereof'' suggests dedication, the definition of those words as including ''a person'' or ''private corporation'' suggests the contrary, and the language that is now codified in section 216, subdivision (c) does not require that the initial performance of service or delivery of a commodity be made ''to the public or any portion thereof.'' It is also significant that in several early decisions the commission assumed jurisdiction over utilities that fell within the literal definitions of the Public Utilities Act apparently without regard to whether or not they had dedicated their property to public use. (*Application of San Fernando Mission Land Company* (1914), 4 C.R.C. 384; *Application of Traders Oil Company* (1916), 9 C.R.C. 463; *Application of Traders Oil Company* (1917), 12 C.R.C. 647; *Application of Mary K. Wohlford* (1917), 12 C.R.C. 505; *Calistoga Electric Company* v. *Napa Valley Electric Company* (1917), 13 C.R.C. 280.) Contemporaneously with these decisions, however, this court invoked the concept of dedication in several cases in holding that a public utility could not be compelled to devote its property to a use to which it had not been dedicated. (*Pacific Telephone etc. Co.* v. *Eshleman* (1913), 166 Cal. 640, 680 [137 P. 1119, Ann.Cas. 1915C 822, 50 L.R.A. N.S. 652]; *Palmer (Otay Water League)* v. *Railroad Com-*

*mission* (1914), 167 Cal. 163, 174-175 [138 P. 997]; *Del Mar Water etc. Co.* v. *Eshleman* (1914), 167 Cal. 666, 683 [140 P. 591, 948]; *Atchison etc. Ry. Co.* v. *Railroad Com.* (1916), 173 Cal. 577, 585 [160 P. 828, 2 A.L.R. 975]; see also *Marin Water etc. Co.* v. *Town of Sausalito* (1914), 168 Cal. 587, 595-596 [143 P. 767]; *Palermo L. & W. Co.* v. *Railroad Commission* (1916), 173 Cal. 380, 385 [160 P. 228]; *Camp Rincon Resort Co.* v. *Eshleman* (1916), 172 Cal. 561, 564 [158 P. 186].)

In 1917 in *Associated Pipe Line Co.* v. *Railroad Commission*, 176 Cal. 518 [169 P. 62; L.R.A. 1918C 849], the court held that the Legislature could not declare that pipeline corporations were public utilities unless they had dedicated their property to public use (see also *Producers Transp. Co.* v. *Railroad Com.*, 176 Cal. 499, 504 [169 P. 59]), and since that decision it has consistently interpreted the statutory definitions of public utilities as applying only to utilities that have dedicated their property to public use. (*Allen* v. *Railroad Commission*, 179 Cal. 68, 89 [175 P. 466, 8 A.L.R. 249]; *San Leandro* v. *Railroad Commission*, 183 Cal. 229, 232 [191 P. 1]; *Story* v. *Richardson*, 186 Cal. 162, 167 [198 P. 1057, 18 A.L.R. 750]; *Richardson* v. *Railroad Commission*, 191 Cal. 716, 720 [218 P. 418]; *Klatt* v. *Railroad Commission*, 192 Cal. 689, 702-703 [221 P. 926]; *Southern Cal. Edison Co.* v. *Railroad Com.*, 194 Cal. 757, 763-764 [230 P. 661]; *Trask* v. *Moore*, 24 Cal.2d 365, 372-373 [149 P.2d 854]; *Samuelson* v. *Public Utilities Com.*, 36 Cal.2d 722, 732-733 [227 P.2d 256]; *Souza* v. *Public Utilities Com.*, 37 Cal.2d 539, 542-543 [233 P.2d 537]; see also *Commercial Communications* v. *Public Util. Com.*, 50 Cal.2d 512, 523-524 [327 P.2d 513]; *California Water & Tel. Co.* v. *Public Util. Com.*, 51 Cal.2d 478, 494 [334 P.2d 887]; *Pajaro Valley Cold Storage Co.* v. *Public Utilities Com.*, ante, pp. 256, 261-263 [5 Cal.Rptr. 313, 352 P.2d 721].)

In 1919 the commission undertook an investigation of the services rendered by certain public utility gas corporations and ordered that several oil companies who sold gas to the utilities be made parties to determine whether the oil companies were also public utilities. (*Matter of Midway Gas Co.*, 17 C.R.C. 569, 571-572.) Thereafter, however, the oil companies were apparently dropped from the case and no express decision as to their status appears. In its report to the Governor for the period from July 1, 1926, to June 30, 1927, the commission directed attention to the problem of the waste of natural gas in the oil and gas production industry but pointed

out that necessary regulation was "outside of the jurisdiction of the Railroad Commission." (P. 92.) In 1929 it refused to consider the merits of a contract for the purchase of gas by a public utility gas corporation from a California producer (*Matter of Southern California Gas Company*, 33 C.R.C. 396, 398), and in 1951 it stated, "At this point we desire to observe that the price charged this utility by gas producers is not fixed by this Commission or other state authority. Thus, the utility buys in an unregulated field and sells in a regulated field. Unlike several other states, this state does not, by law, fix the price of gas charged by producers. This is a matter which might well have the consideration of the legislature." (*Pacific Gas & Electric Co.*, 51 Cal. P.U.C. 130, 147.) In 1953 it terminated and dismissed an investigation into gas availability and service in California, and in its decision stated, "The producers in California are not subject to regulation by the Commission and the utilities must depend upon contracts or other arrangements for obtaining the necessary local supply of gas." (*Decision No. 49127*, 52 Cal. P.U.C. 766, 771.) It ordered its secretary to mail copies of this decision to the Governor and members of the Legislature. (52 Cal. P.U.C. at p. 776.) (See also *Gas Supply Company of California*, 52 Cal. P.U.C. 324, 325, 326; *Pacific Gas and Electric Company*, 53 Cal. P.U.C. 133, 134.)

Since their enactment in substantially their present form in 1913, the Legislature has repeatedly reenacted the provisions of sections 207 and 216 in amending, reenacting, and codifying the Public Utilities Act. (Stats. 1915, ch. 91, pp. 118-119; Stats. 1917, ch. 77, pp. 1333-1334; Stats. 1919, ch. 304, p. 493; Stats. 1927, ch. 130, pp. 248-249; Stats. 1933, ch. 784, pp. 2088-2089; Stats. 1937, ch. 896, p. 2478; Stats. 1951, ch. 764, pp. 2027, 2029.)

We may assume without deciding that initially dedication as a prerequisite to public utility regulation was imposed as a limitation on the broad language of the Public Utilities Act solely to meet constitutional objections that are no longer valid. In view of the history of the act and the substantial reliance on its consistent interpretation and application by this court and the commission for more than 40 years, however, it must be concluded that the Legislature by its repeated reenactment of the definitions of public utilities without change has accepted and adopted dedication as an implicit limitation on their terms.

There is no merit in the contention that this conclu-

sion renders the broad language of section 207 and subdivision (c) of section 216 superfluous. Those provisions make clear that a utility that has dedicated its property to public use is a public utility even though it may serve only one or a few customers or a utility that in turn serves the public. (See *Commercial Communications* v. *Public Util. Com.*, 50 Cal.2d 512, 523 [327 P.2d 513] ; *Van Hoosear* v. *Railroad Commission*, 184 Cal. 553, 557 [194 P. 1003].) Subdivision (c) of section 216 also allays any doubt that a public utility that has been serving the public directly remains such even though it turns its distributing system over to a publicly or privately owned utility and thereafter limits its own business to supplying the utility that directly serves the public.

 We need not look beyond the oil and gas industry in this state to see what an abandonment of the requirement of dedication would entail. It would subject every oil and gas producer that has sold or proposes to sell gas for light, heat, or power or for resale to the public to the jurisdiction of the commission. That jurisdiction is extensive, and the commission is obligated to exercise it. (Pub. Util. Code, § 2101.) It includes jurisdiction over rates (Pub. Util. Code, § 728), services (Pub. Util. Code, § 761), construction of plants and extensions thereof (Pub. Util. Code, § 1001), issuance of securities (Pub. Util. Code, § 816), and the disposing or encumbering of operative property. (Pub. Util. Code, § 851.) The oil and gas producers in this state have not been subject to such jurisdiction when they have not dedicated their property to public use. Although we may assume that the oil and gas industry would have been successfully developed even if it had been fully regulated by the commission, it would necessarily be different in many respects from what it is. Such broad regulation as that provided by the Public Utilities Act could not help but have a substantial impact on the development of any industry subject to it. To impose such regulation on the oil and gas industry as it exists today by a new construction of the act would create manifold problems. Only the Legislature can properly determine whether or not such regulation or some other form of regulation should now be imposed to promote the public interest.

Oil and gas are ordinarily produced together from the same wells and fields, but the Public Utilities Act makes no provision for the regulation of oil corporations. Although a corporation may operate part of its business as a public utility and part in a purely private capacity (*California*

*Mfrs. Assn.* v. *Public Utilities Com.,* 42 Cal.2d 530, 537 [268 P.2d 1] ; *Lamb* v. *California Water & Tel. Co.,* 21 Cal.2d 33, 40 [129 P.2d 371] ; *Marin Water etc. Co.* v. *Town of Sausalito,* 168 Cal. 587, 596 [143 P. 767]), the administrative difficulties of effective regulation when the two parts are so closely interrelated as the production of oil and gas are apparent. Whereas a producer's unequivocal dedication of part of its property to a public use affords a basis for segregating its regulated from its unregulated activity, if that settled standard were now to be abandoned, some other method would have to be developed for segregating oil and gas operations for purposes of regulation.

Moreover, it is not unreasonable to assume that the requirement of dedication has been of some value in obviating regulation of many small producers whose activities fall within the literal definitions of the act but are too restricted to merit public concern. Although it may be true that this requirement has also permitted large producers to escape regulation that might be wise, nevertheless, existing law provides no alternative to dedication for selecting those to be regulated. Abolition of one standard to determine who should be regulated would compel choice of another.

It also bears emphasis that many of the major oil and gas producers in this state, including Richfield, are foreign corporations that cannot lawfully transact public utility business in this state. (Pub. Util. Code, § 704.) Of course, a foreign corporation cannot escape public utility regulation or evade public utility obligations on the ground that its activities are illegal. (See *Webster Mfg. Co.* v. *Byrnes,* 207 Cal. 630, 640 [280 P. 101] ; *Babcock* v. *Don Lugo Corp.,* 45 C.R.C. 699, 701.) We cannot reasonably assume, however, that in repeatedly reenacting the relevant definitions of public utilities the Legislature rejected the requirement of dedication as an implicit limitation on those definitions, for had it done so, it would have rendered unlawful by implication alone a substantial part of the development of the oil and gas industry in this state.

Finally, even if public utility regulation were extended to all oil and gas producers who fall within the literal language of the act, producers who used their gas themselves or sold it to others to manufacture into chemical products or to use for other purposes not specified in the act would escape regulation. Regulation dependent on how the producer

disposed of his gas might stimulate less desirable unregulated uses at the expense of more desirable regulated uses.

The producer's freedom under existing law to determine how his gas shall be disposed of so long as he does not dedicate his property to public use has not resulted in sufficient misuse of gas or sufficiently wasteful marketing practices to induce the Legislature to change it. The Legislature is uniquely able to amass economic data and hold hearings where it can give heed to many representatives of the public besides parties to a controversy. It can best determine whether there should be further regulation of the oil and gas industry, and if so, the form it should take.

Southern Counties contends, however, that even if Richfield is not subject to regulation as a public utility gas corporation, it was nevertheless required to secure a certificate of public convenience and necessity to construct a pipeline from its Cuyama Valley and San Joaquin Valley fields to supply gas to Edison. It relies on the provision of Public Utilities Code, section 1001, that "No railroad corporation whose railroad is operated primarily by electric energy, street railroad corporation, *gas corporation,* electrical corporation, telegraph corporation, telephone corporation, or water corporation shall begin the construction of a street railroad, or of a line, *plant,* or system, *or any extension thereof,* without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction." (Italics added.) It points out that this requirement is not expressly limited to public utility gas corporations, *and since regulation of competition between* public and nonpublic utilities is cognate and germane to the regulation of public utilities, it contends that the Legislature constitutionally vested the commission with certification jurisdiction over all gas corporations defined in sections 221 and 222. (See *Morel* v. *Railroad Commission,* 11 Cal.2d 488, 496 [81 P.2d 144].)

In the past, however, the commission has interpreted section 1001 as applicable only to public utilities, as is illustrated by its failure to subject the oil and gas industry to certification jurisdiction. (See also *People* v. *Orange County Farmers & M. Assn.,* 56 Cal.App. 205, 210 [204 P. 873]; *Baldwin Park Domestic Water Co.* v. *Union Trust and Savings Bank,* 5 C.R.C. 685, 686.) We agree with this interpretation, for when the language of section 1001 relied upon by Southern Counties is read in context it is clear that the naming of

specific types of corporations was intended, not to extend the certification requirement to other than public utilities, but to specify the public utilities that must secure certificates. Thus, the second paragraph of section 1001[3] deals with disputes between public utilities, section 1002[4] requires certification of "a public utility of a class specified in Section 1001" to exercise "any right or privilege under any franchise or permit hereafter granted . . ." and section 1006[5] provides for enforcement of section 1001 by cease and desist order only against "a public utility of the class specified in Section 1001." It is also significant that when the Legislature has undertaken to give the commission jurisdiction to regulate nonpublic utility businesses whose regulation is cognate and germane to the regulation of public utilities, it has ordinarily done so by adopting specific legislation dealing with such nonpublic utility businesses, such as the Highway Carriers' Act (Pub. Util. Code, § 3501 et seq.) now codified in division 2 of the Public Utilities Code. (Regulation of Related Businesses by the Public Utilities Commission.)

 Had the Legislature wished to regulate competition

---

[3]"This article shall not be construed to require any such corporation to secure such certificate for an extension within any city or city and county within which it has theretofore lawfully commenced operations, or for an extension into territory either within or without a city or city and county contiguous to its street railroad, or line, plant, or system, and not theretofore served by a public utility of like character, or for an extension within or to territory already served by it, necessary in the ordinary course of its business. If any public utility, in constructing or extending its line, plant, or system, interferes or is about to interfere with the operation of the line, plant, or system of any other public utility, already constructed, the commission, on complaint of the public utility claiming to be injuriously affected, may, after hearing, make such order and prescribe such terms and conditions for the location of the lines, plants, or systems affected as to it may seem just and reasonable.

[4]"No public utility of a class specified in Section 1001 shall henceforth exercise any right or privilege under any franchise or permit hereafter granted, or under any franchise or permit heretofore granted but not heretofore actually exercised, or the exercise of which has been suspended for more than one year, without first having obtained from the commission a certificate that public convenience and necessity require the exercise of such right or privilege. This section shall not validate any right or privilege now invalid or hereafter becoming invalid under any law of this State."

[5]"When a complaint has been filed with the commission alleging that a public utility of the class specified in Section 1001 is engaged or is about to engage in construction work without having secured from the commission a certificate of public convenience and necessity as required by this article, the commission may, with or without notice, make its order requiring the public utility complained of to cease and desist from such construction until the commission makes and files its decision on the complaint or until the further order of the commission."

between public utility and nonpublic utility gas corporations by requiring certificates of public convenience and necessity, it is reasonable to assume that it would have done so by requiring nonpublic utility gas corporations to secure certificates to provide service, not merely to build plants or extensions thereof. Regulation of plant construction and extension is a meaningful adjunct to overall public utility regulation, but as applied to otherwise unregulated nonpublic utility gas corporations, it would serve haphazardly at best to protect public utility gas corporations from undesirable competition. Thus, unless an oil and gas producer had dedicated its property to a public use and was therefore subject to regulation as a public utility, it would be free after its plant was constructed or extended, to withdraw it from the use approved by the commission and to use it to compete with regulated utilities. It could do the same thing with a plant originally constructed to provide gas for other than light, heat, or power, to which section 1001, however interpreted, would not apply. On the other hand, any nonpublic utility oil and gas producer that was selling any of its gas for light, heat, or power would be required, within the limitations set forth in section 1001, to secure commission approval to drill new wells or otherwise extend its facilities. To reinterpret section 1001 to require such approval would not only create many of the same problems that would flow from reinterpreting the definitions of public utilities, but would do so without providing the overall public utility regulation necessary to make the certification requirement of section 1001 meaningful.

The question remains whether the commission's orders can be sustained on the ground that Richfield is a public utility that has dedicated its property to a public use. The commission found that Richfield ''in respect to its gas operations, is a public utility gas corporation subject to the jurisdiction of this Commission (1) which has dedicated gas reserves in this State over and above the requirements of gas for its own use and gas facilities in this State to the public and (2) which has performed and is performing service and has delivered and is delivering gas to private corporations which in turn either directly or indirectly, mediately or immediately, perform such service and deliver such gas to the public.''

In considering the question of dedication it is essential to bear in mind that even under the commission's view, only part of Richfield's property has been dedicated to public use. ▆▆▆ Although Richfield could not withdraw property from

a use to which it had been dedicated without the commission's consent or escape regulation by converting all or a part of a public utility service into a nonpublic utility service (*Western Canal Co.* v. *Railroad Commission,* 216 Cal. 639, 647 [15 P.2d 853] ; *Van Hoosear* v. *Railroad Commission,* 184 Cal. 553, 557 [194 P. 1003] ), Richfield remains free to use property it has not dedicated to public use as it sees fit so long as it does not dedicate such property or prejudice any public utility obligations it may have assumed. (*Lamb* v. *California Water & Tel. Co.,* 21 Cal.2d 33, 40 [129 P.2d 371] ; *Mound W. Co.* v. *Southern Calif. Edison Co.,* 184 Cal. 602, 610 [194 P. 1014] ; *Marin Water etc. Co.* v. *Town of Sausalito,* 168 Cal. 587, 596 [143 P. 767].) Thus, even if the evidence would support a finding that Richfield had dedicated some of its gas reserves and facilities to public use, we must annul the commission's orders if they seek to regulate or prohibit Richfield's nonpublic utility operations.

To support its finding that Richfield has dedicated its gas reserves over and above its own requirements, the commission relies on Richfield's disposition of its surplus gas and the testimony of Travers, Richfield's vice president. Richfield made two small sales of gas in the Sacramento Valley to the Pacific Gas and Electric Company, a public utility gas and electrical corporation, without restriction as to the use to be made thereof. It has agreed to sell to Edison 500 billion cubic feet of gas at specified daily rates of delivery within the next 25 years. In April, 1955, it entered into a five-year contract with Pacific Lighting Gas Supply Company for the exchange of gas between its oil and gas fields and the sale of gas to Pacific Lighting. Pacific Lighting is a public utility gas corporation that purchases gas from producers and resells it to its affiliates, including Southern Counties, who sell gas to the general public.

The Pacific Lighting contract defined certain of Richfield's fields as basic gas fields and the gas therefrom as basic gas. Richfield could add new fields to the basic gas fields or withdraw any basic gas field from the operation of the contract if it connected such field with its own pipeline facilities. Certain other fields of Richfield were defined as emergency fields and the gas therefrom as emergency gas. Richfield could deliver basic gas not needed for production or injection in the basic gas fields to Pacific Lighting, and Pacific Lighting agreed to the extent of its ability to accept such gas not to exceed five billion cubic feet per year and deliver an equivalent

amount of gas to Richfield at other points in its pipeline system. Pacific Lighting could curtail the exchange of basic gas in the winter and make up the deficiency before the following winter. Richfield agreed to pay specified fees for exchange service. Pacific Lighting could elect to purchase emergency gas during the winter in amounts previously specified but not to exceed the amounts it exchanged for Richfield the previous year. Richfield could offer basic gas for sale instead of exchange, but it did not do so. It could also offer emergency gas not requested by Pacific Lighting for sale or exchange in the event of temporary plant shutdowns or other temporary emergency conditions. Pacific Lighting exercised its option to buy emergency gas during the winters of 1955-1956 and 1957-1958.

Travers testified that the first call on Richfield's gas was for pressure maintenance in its oil fields, and that for many years it had refrained from making any long-term contracts for the sale of gas on a day-to-day basis. Richfield sells gas to the gas utilities, however, to meet the peak needs of their firm customers and it "felt that the company should not and could not refuse to make its facilities and its reserves available" for that purpose. In the last year or two Richfield added substantially to its reserves and reached a point where it was willing to sell a limited amount of gas on a day-to-day basis. Edison offered a better price than either of the large gas utilities, so Richfield accepted Edison's offer. Richfield has refused to sell gas to industrial users, and it has no plans to sell gas except to Edison and to the gas utilities for peaking purposes. Before Richfield executed its present contract with Edison, an attempt was made to settle its controversy with Southern Counties over its proposed sale of gas to Edison by negotiating a contract whereby Richfield would supply gas to Edison through arrangements with Pacific Lighting and Southern Counties. The negotiations proved abortive. In discussing them, Travers testified that he objected to a proposed clause that would have permitted Pacific Lighting to purchase gas from Richfield. "Now, I let that go in, into the final draft but was advised by someone else the last day before we considered signing it that that might constitute a dedication of our reserves at that point to Pacific Lighting Corporation which, as I stated earlier, we have never done and do not propose to do except for peaking purposes." Travers also testified that Richfield wanted to sell gas at a faster rate than that provided in the Edison contract, and that "We think

that the second highest use for our gas in California is to meet the peak requirements of the utility companies and we are still in business, we are still prepared to render that sort of service.'' He further stated, ''Now, you realize that gas for peaking purposes normally does not involve large volumes but it does involve very high rates, so we feel that we can maintain an exception of peaking gas from the general statement that we have sold all the gas to Edison Company that we wish to sell at this moment.''

Richfield contends that it has not dedicated its gas reserves to public use by holding itself out as willing to sell gas to the public or any portion thereof; that it has only sold gas to selected corporations pursuant to negotiated contracts. (See *California Water & Tel. Co.* v. *Public Util. Com.*, 51 Cal.2d 478, 494 [334 P.2d 887] ; *Commercial Communications* v. *Public Util. Com.*, 50 Cal.2d 512, 523 [327 P.2d 513] ; *Souza* v. *Public Utilities Com.*, 37 Cal.2d 539, 540, 542-543 [233 P.2d 537] ; *Samuelson* v. *Public Utilities Com.*, 36 Cal.2d 722, 732-733 [227 P.2d 256] ; *S. Edwards Associates* v. *Railroad Com.*, 196 Cal. 62, 70 [235 P. 647].) It asserts that Travers' reference to dedication of gas reserves for peaking purposes is merely descriptive of its contract with Pacific Lighting, and contends that the terms of that contract negative any inference of dedication. Thus it points out that Pacific Lighting could purchase gas only in limited amounts, from a limited area, for a limited time, and upon limited terms, and that Richfield reserved the right to withdraw any of its basic fields from the operation of the contract and could defeat Pacific Lighting's option to purchase gas by failing to tender gas for exchange. Since Richfield, like the other oil and gas producers, can engage in the business of selling gas without dedicating its property to public use, it contends that Travers' testimony that ''we are still in business, we are still prepared to render'' peaking service is consistent with its not having dedicated its gas reserves. Moreover, since Richfield is a Delaware corporation that cannot legally operate as a public utility in California, it contends that Travers' testimony that Richfield felt that it ''should not and could not refuse to make its facilities and its reserves available'' for peaking purposes should not be interpreted as evidence of a willingness to enter into an unlawful business, but only as evidence of a willingness to fulfill emergency public needs by providing emergency service on a selective basis. Finally, it contends that peaking service involves such uncertain quantities of gas that its

very nature is inconsistent with an unequivocal and irrevocable dedication of property to public use.

 Resolution of any conflicting inferences that might be drawn from Travers' testimony was for the commission, however, and had it found that Richfield had dedicated its gas reserves for peaking purposes to the extent it had supplied such service in the past, we are not prepared to say that its finding would be unsupported. We leave that question open, for the commission did not limit its assertion of jurisdiction to Richfield's peaking services. It asserted jurisdiction over all of Richfield's gas reserves and facilities not needed for Richfield's own use. Richfield's service to Edison, however, is a new service supported by additional recently-acquired reserves that Richfield has not dedicated to peaking services, and it did not dedicate such reserves by agreeing to sell gas to Edison, for that sale was made to a selected customer and like service was denied to others.

Southern Counties and the commission contend, however, that Richfield has dedicated the pipeline through which it supplies Edison to public use and that therefore at least in its use of that line it is a public utility gas corporation subject to regulation as such. They base this contention on the common-carrier condition in Richfield's permit to build part of its pipeline across the Los Padres National Forest. Condition 18 of Richfield's permit provides that "The applicant agrees to operate the pipeline during the period of this permit as a common carrier to the extent required as to rights-of-way by the provisions of the Mineral Leasing Act, and, within 30 days after request of the Secretary of the Interior, or his delegate, as to rights-of-way, to file rate schedule and tariff for the transportation of oil or gas, as the case may be, as such common carrier with any regulatory agency having jurisdiction over such transportation, as the Secretary or his delegate may prescribe." The Mineral Leasing Act provides that "Rights-of-way through the public lands, including the forest reserves of the United States, may be granted by the Secretary of the Interior for pipeline purposes for the transportation of oil or natural gas . . . under such regulations and conditions as to survey, location, application, and use as may be prescribed by the Secretary of the Interior and upon the express condition that such pipelines shall be constructed, operated, and maintained as common carriers and shall accept, convey, transport, or purchase without discrimination, oil or natural gas pro-

.duced from Government lands in the vicinity of the pipeline in such proportionate amounts as the Secretary of the Interior may, after a full hearing with due notice thereof to the interested parties and a proper finding of facts, determine to be reasonable: *Provided*, That the common carrier provisions of this section shall not apply to any natural gas pipeline operated by any person subject to regulation under the Natural Gas Act or by any public utility subject to [local regulation]: . . . Failure to comply with the provisions of this section or the regulations and conditions prescribed by the Secretary of the Interior shall be ground for forfeiture of the grant by the United States district court for the district in which the property, or some part thereof, is located in an appropriate proceeding." (30 U.S.C. § 185.)

Richfield contends that the common-carrier condition imposes only the limited obligations of common-law common carriage and can be enforced only by forfeiture and that therefore acceptance of a permit subject to that condition does not constitute dedication of a pipeline to public use within the meaning of California law. In this respect it points out that the terms of the federal act itself contemplate the granting of rights-of-way to both public utility and nonpublic utility applicants.

Richfield also contends that since common carriers of gas were covered by the now-repealed provisions of the petroleum pipeline statutes of 1913 (Stats. 1913, ch. 286, p. 532; ch. 327, p. 657), they were excluded by implication from the definition of gas corporations. (Pub. Util. Code, §§ 221-222.) Moreover, it asserts that the same implied exclusion would result if a common carrier of gas is a pipeline corporation under existing law as a common carrier of "crude oil or other fluid substances except water through pipe lines." (Pub. Util. Code, §§ 227-228.) It contends, therefore, that its acceptance of a permit subject to the common-carrier condition would at most justify a finding that it is a pipeline corporation. Moreover, since pipeline corporations are not subject to the certification provisions of sections 1001 and 1002, it concludes that the commission's cease and desist order cannot stand.

We are not persuaded that a corporation that owns property for the "transmission . . . of gas" (Pub. Util. Code, § 221) as a common carrier is not a gas corporation within the meaning of sections 221 and 222 because it was once also defined as a pipeline corporation or is arguably so defined today on the theory that gas is a "fluid" substance within the

meaning of section 227. Moreover, despite the differences between the obligations imposed by the common-carrier condition of the federal act and those imposed on public utilities by the California act, we believe that the holding out to serve the public implicit in common carriage is at least substantial evidence that would support a finding that a federal permittee had dedicated its pipeline to public use for the common carriage of gas.

Richfield, however, does not seek to use its pipeline for the common carriage of gas and it may never be called upon to do so. It wishes to use its pipeline solely to transport its own gas in the course of its nonpublic utility activities, and at most it has evidenced a willingness to operate its pipeline as a common carrier when and if it is called upon to do so. The Public Utilities Act is not concerned with Richfield's purely nonpublic utility activities (see *California Water & Tel. Co.* v. *Public Util. Com.*, 51 Cal.2d 478, 488 [334 P.2d 887], and dissenting opinion at p. 509; *Commercial Communications* v. *Public Util. Com.*, 50 Cal.2d 512, 518 [327 P.2d 513]), and its certification provisions may not therefore be invoked to prohibit the construction and use of facilities for such nonpublic utility activities merely because Richfield may in the indefinite future wish or be called upon to make such facilities available for public use. When and if Richfield wishes or is called upon to make its pipeline available for the common carriage of gas, it may then be determined whether its private use must be curtailed to avoid conflict with any obligation to the public it assumed in accepting a federal permit subject to the common-carrier condition. (See *Commercial Communications* v. *Public Util. Com.*, 50 Cal.2d 512, 518 [327 P.2d 513].)

The orders are annulled.

Gibson, C. J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

The petitions of Respondent and of the Real Party in Interest for a rehearing were denied July 27, 1960.