Filed 12/9/25; Certified for Publication 1/7/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MENDOCINO RAILWAY,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>JOHN MEYER,<br><br>     Defendant and Respondent. | A168497, A168959<br><br>(Mendocino County<br>Super. Ct. No. SCUK-CVED-2020-74939) |

Plaintiff Mendocino Railway appeals from the judgment following a multi-day bench trial in which the trial court ruled Mendocino Railway did not qualify as a public utility with the power of eminent domain—and even if it had public utility status—it failed to meet the statutory requirements of eminent domain.  (See Pub. Util. Code, § 611; Code Civ. Proc., § 1240.030.)  Concluding the trial court erred in its interpretation of the relevant law and in its application of the facts to the law, we reverse.[1]

---

[1] On January 30, 2025, we granted motions for leave to file amicus curiae briefs submitted by the California Coastal Commission and the American Short Line and Regional Railroad Association.  We deferred ruling on the California Coastal Commission's request for judicial notice pending the resolution of this appeal.  We now deny that request on the grounds that the documents requested for notice are not relevant to resolution of this appeal.

1

# BACKGROUND

## A. *Eminent Domain Action*

In 2020, Mendocino Railway filed an action seeking to acquire by eminent domain a 20-acre undeveloped parcel (the property) in Willits, California owned by John Meyer. Mendocino Railway's railroad runs along the southern boundary of the property. The stated purpose of the acquisition is the "construction and maintenance of rail facilities related to" Mendocino Railway's "ongoing and future freight and passenger rail operations" (the project).

Mendocino Railway avers it is "a California railroad corporation organized and existing under the laws of the State of California and is authorized by law to exercise the power of eminent domain to acquire private property for public use" under California Constitution, Article I, section 19; Public Utilities Code sections 229, 230, 611 and 7526, subdivision (g); and Code of Civil Procedure section1230.010 et seq.

## B. *Evidence at Trial*

The sole witness at trial was Robert Pinoli, the President and Chief Executive Officer of Mendocino Railway.

Origins of Rail Service Along the California Western Railroad

The California Western Railroad (CWR) consists of a 40-mile stretch of railway between Fort Bragg and Willits. The CWR was built in 1885 as a means to haul redwood trees to a lumbermill in Fort Bragg. However, it has "provided significant passenger service since 1912" and "remains a vital link between Willits and the coastal communities." Early in its history, CWR began providing passenger excursion services which later became known as the "Skunk Train."

Mendocino Railway's Acquisition of CWR

In 2002, California Western Railroad, Inc. (CWRR), the then-owner of CWR, filed for Chapter 11 Bankruptcy under Subchapter IV (Railroad Reorganization). (See 11 U.S.C. § 1161 et seq.) Sierra Railroad Company (SRC), a holding company without common carrier status successfully bid to acquire the assets of CWR. SRC then formed Mendocino Railway, also a holding company, to purchase CWR's assets. Mendocino Railway initially intended to operate CWR with the help of its affiliated entities, Sierra Northern Railway (SNR), Midland Railroad Enterprises Corporation (MREC), and Sierra Entertainment (a tourism entertainment and passenger operations company) (SE); SNR, MREC, and SE are subsidiaries of SRC. In 2004, the Surface Transportation Board (STB) approved Mendocino Railway's purchase of CWR as a Class III regulated railroad.[2]

Passenger Commuter and Excursion Services

Pinoli testified that affiliated-entity SE provided passenger commuter service and excursion service on behalf of Mendocino Railway from 2004 until 2008. Starting in 2008, Mendocino Railway itself began providing commuter passenger service and excursion services. Mendocino Railway provided its published tariffs regarding passenger fares from 1993 to 2021, which listed CWR's prior owner and Mendocino Railway as the issuers and passenger service providers. Pinoli explained that tariffs are "a way for the railroad to make its services available to the public". Pinoli testified that passenger rail service remains currently available with no foreseeable stoppage.

Freight Service

_____

[2] The STB divides railroads into three categories based on their operating revenues; Class III railroads have the smallest operating revenues. (See 49 U.S.C. § 20102; 49 C.F.R. § 1201.1-1.)

3

Pinoli testified that SNR provided freight services on Mendocino Railway's behalf from 2004 until 2021. He explained that by 2021 SNR was "simply just too busy" to offer services at such a "remote location" and as a result, Mendocino Railway took over the freight services. Even before Mendocino Railway assumed the freight services from SNR, from 2020 to 2021 Mendocino Railway transported aggregate and steel structures for Trout Unlimited in connection with two streambed restoration projects along the CWR line; the freight transportation for Trout Unlimited was for compensation. While Mendocino Railway provided transportation for Trout Unlimited, its "freight train was made a priority, and the railroad's excursion schedule was halted to yield to the freight operations of the railroad."

Pinoli testified that Mendocino Railway had no intention to cease its freight services.

Access to Interstate Rail System

At the Willits end of the CWR line, there is a depot located on the Northwestern Pacific (NWPY) track, on which Mendocino Railway has trackage rights. The CWR line connects to the NWPY track, which connects to the Union Pacific Railroad mainline. However, maintenance issues has kept the NWPY line closed, resulting in a stoppage of freight services. Although there is "no longer direct connection to the rest of the country through the NWPY track, Amtrack allows" Mendocino Railway "to have access" to the Union Pacific Railroad mainline.

Tunnel Collapse

In 2015, the CWR line was severed when one of its tunnels collapsed. Pinoli testified that even with the tunnel collapse, Mendocino Railway has still been able to offer and perform non-excursion passenger and freight transportation on either side of the tunnel. He further explained the tunnel

4

collapse "hasn't stopped the railroad from getting people to their remote residences or summer camps" or "transporting goods and services to property owners along the route."

Allocation of Revenue

Pinoli testified that as of 2020, 90% of Mendocino Railway's revenue came from the excursion train activities. The other 10% of Mendocino Railway's income came from leases and easements. When asked whether this 90/10 allocation generally represented the last ten years, Pinoli explained he did not have Mendocino Railway's financial statements in front of him and he did not want to speculate. When further asked why he did not have the financial information with him, Pinoli explained that Mendocino Railway was not asked to provide such information. He further indicated: "If the Court felt it were necessary, then we would be happy to provide that information."

Need for Expansion

Pinoli testified that Mendocino Railway lacks adequate maintenance or repair facilities, yard space, equipment storage space, or dedicated areas for freight operations at the Willits end of the CWR line. As a result, Mendocino Railway's maintenance and repair activities take place at temporary facilities and outdoors on the tracks at that end. Acquisition of the property would allow Mendocino Railway to fully operate its freight rail services with storage yards, maintenance, and repair shops, transload facilities, rail car storage capacity, and a passenger depot.

The Project

Pinoli testified that Mendocino Railway undertook an extensive search, investigation, and analysis of several potentially suitable locations for the project, evaluating six other sites in addition to the property. In its search,

5

Mendocino Railway considered various factors and site characteristics, including but not limited to size, shape, location, and topography. Mendocino Railway also evaluated the private impacts of acquiring the property such as displacement of residential or commercial occupants.

Pinoli explained the property was the only site that met the key requirements for the project. The property is a relatively level, undeveloped, 20-acre parcel located along Mendocino Railway's main line near Willits, with good accessibility to a highway. Also, Meyer initially indicated a willingness to sell.

An early rendering of the site plan included a campground, pool, and recreational vehicle camping area. Pinoli explained the campground idea came from "one individual in our organization," who was "a very energetic entrepreneur." He further explained that the idea was suggested during the COVID-19 pandemic, when creation of outdoor spaces was prevalent. Pinoli, however, emphasized that "campgrounds are not something that we have an interest in." He added that campgrounds are not part of what Mendocino Railway does [a]nd it's certainly not a part of what Mendocino Railway is going to do." Pinoli further stressed, "I serve as the president and chief executive officer of our company. And while I do have board members and colleagues that I work with and collaborate with, the decisions of the company stop with me. [¶] I grew up in this community. I'm four generations into this community, and I've spent 30 years -- I have spent my entire career dedicated to the preservation of a railroad that was founded in 1885. [¶] I'm entrusted with this legacy operation. I'm not going to say something today, and do something different tomorrow. We will not be building a campground."

An updated site plan from 2022 omits the campground and recreation vehicle park.  The updated site plan includes a "maintenance/repair facilities and yard", "rail transload facility", "natural habitat preserve", "depot and offices", and "parking."  The 2022 site plan depicts the train maintenance facility next to two residential houses, one of which Meyer owns.  Pinoli explained the maintenance facility would be a "completely enclosed" and "indoor facility."  The work that would be done on the rail cars would occur inside the facility.  Pinoli did not believe the repair work "would be . . . any noisier than the highway traffic adjacent to [the] houses."  He did admit, however, that the idling and operation of trains is loud, but believed the maintenance facility and the operation of such trains directly behind the residences would have no real impacts on the residents living there.  When asked whether it was possible to move the maintenance facility farther away from the houses, Pinoli indicated he would need to review any such change and discuss it with Mendocino Railway's engineers.

Community Interest

Mendocino Railway presented letters from potential customers expressing interest for transloading services at Willits.  These customers included Flow Beds, North Coast Brewing Company, Geo Aggregates, Redwood Coast Fuels (and other natural gas companies), and Lyme Redwood Forest Company (and other timber companies).  Pinoli explained that the letters had been part of Mendocino Railway's grant applications in 2018, 2019, and 2020.

Pinoli further testified that Mendocino Railway had worked "with other common carrier public utilities in the past, specifically, . . .[¶] . . . [¶]. . . the Mendocino Transportation Authority"—the local bus service.  As part of that program, bus passengers could ride the train with certain passes."

7

Public Utilities Commission Reports Regarding Mendocino Railway's Predecessor

*January 21, 1998 Decision*

On January 21, 1998, the California Public Utilities Commission (CPUC) made certain findings about Mendocino Railway's predecessor, CWRR. (*Matter of California Western Railroad, Inc.* (1998) 78 Cal. P.U.C. 2d 292 (*January 21, 1998 CPUC Decision*). CWRR sought deregulation of its excursion service. (*Id.* at *1.) CWRR also sought CPUC approval to "reduce its commuter service." (*Id.* at *2.) In granting the application, the CPUC found that "[i]n providing its excursion service, CWRR is not functioning as a public utility . . . [¶] . . . [¶] . . . [W]e conclude that CWRR's excursion service should not be regulated by the [CPUC]." (*Id.* at *8.) The CPUC, however, recognized that CWRR also provided "passenger and freight operations" in addition to the excursion service. (*Ibid.*) The CPUC left the proceeding "to consider CWRR's request to reduce its commuter service." (*Id.* at *11.)

*May 21, 1998 Decision*

On May 21, 1998, the CPUC rendered a decision on CWRR's motion to withdraw its request to reduce commuter service on the CWR line. (*Matter of California Western Railroad, Inc.* (1998) Cal. P.U.C. Dec. No. 98-05-054 (*May 21, 1998 CPUC Decision*).) The CPUC reiterated that CWRR "transports passengers and freight between Fort Bragg and Willits" and "serves a few communities" in between. (*Id.* at *2.) The CPUC noted the "passenger service" was "[i]n addition" to the excursion service. (*Ibid.*) In granting CWRR's request to withdraw its request to reduce commuter service, the CPUC explained it was "in the best interest of passengers . . . us[ing] CWRR's service." (*Id.* at *4.)

*August 6, 1998 Decision*

On August 6, 1998, the CPUC approved CWRR's request for approval of certain stock transactions. (*Matter of California Western Railroad, Inc.* (1998) 81 Cal. P.U.C. 2d 514 (*August 6, 1998 CPUC Decision*). In it, the CPUC noted that "[b]efore a public utility may issue stocks and certificates, it must obtain an order from this Commission authorizing the issue." (*Id.* at *10–11.) In its "findings of fact," the CPUC found CWRR "is a common carrier railroad engaged in interstate commerce," and "operates railroad passenger and freight services between Fort Bragg and Willits, California." (*Id.* at *17.) In its "conclusions of law," the CPUC held: "[CWRR] is a public utility within the meaning of Section 216(a) of the P[ublic] U[tilities] Code 216(a)." (*Id.* at *21.)

Staff Attorney Letter Regarding Mendocino Railway

Meyer introduced an August 12, 2022 letter from a CPUC staff attorney opining that Mendocino Railway was not a public utility. The staff attorney relied on the *January 21, 1998 CPUC Decision* regarding CWRR's deregulation request for its excursion services.

Railroad Retirement Board Decision

After the close of testimony, Meyer obtained a copy of the "Employer Status Determination For Sierra Entertainment and Mendocino Railway" that was issued by the Railroad Retirement Board (RRB) on September 28, 2006. The trial court granted Meyer's request to reopen the case and additional testimony related to this decision was presented. The RRB determined neither Mendocino Railway nor its affiliate SE qualified as a railroad "employer" obligated to pay into the federal railroad retirement fund. The decision rested primarily on the grounds that public passenger excursion tours "within one state" did not constitute rail transportation. In making this

9

determination, the RRB noted that due to structural problems there had been "no service" for approximately 10 years on Mendocino Railway's line that "connects to another railway line". Since Mendocino Railway's access line was "unusable", the RRB determined Mendocino Railway's "ability to perform common carrier services is thus limited to the movement of goods between points on its own line, a service it does not perform."

## C. Trial Court's Ruling

The trial court concluded Mendocino Railway was not a public utility entitled to eminent domain—and even if it had public utility status, it failed to meet the statutory requirements of the eminent domain law. Citing the *January 21, 1998 CPUC Decision*, the court determined that Mendocino Railway's excursion services did not confer public utility status. The court was not persuaded by Mendocino Railway's status as a Class III regulated railroad; rather, that designation "relates to . . . safety regulations" and did not elevate Mendocino Railway to a public utility.

The court further determined Mendocino Railway was not a common carrier because from the time of its acquisition of the CWR line through 2022, it "did not actually perform carrier services." To the extent freight and passenger services allegedly were performed by affiliated entities, Mendocino Railway "did not offer evidence in the form of contracts with the affiliated entities, operating agreements, ledgers, receipts, payments etc."

In making these determinations, the court relied, in part, on the 2006 RRB decision, which the court interpreted as finding Mendocino Railway "was not a common carrier performing freight and passenger services between the time of its acquisition in 2004" through 2022 when it took over operations from SNR "and to date."

10

With respect to Mendocino Railway's revenue, the court stated "[t]here is no dispute that the only evidence of railroad income during the relevant time was and is earned from excursion services only." The court added that Mendocino Railway conceded "excursion service does not" constitute "transportation" and, as such, this service did not bestow public utility status.

The court gave little weight to the letters from local businesses expressing an interest in obtaining freight services once they become available. Any freight service from Fort Bragg to Willits could not occur until the tunnel was repaired and there was no specific time frame for completing the repairs. It was also unclear whether Mendocino Railway had the available funds to complete the necessary repairs "anytime soon." The court added the letters were of limited value because they had been "purposely solicited" by Mendocino Railway "in connection with a grant application to obtain funds from the federal government to improve its line for freight services."

Despite the court finding Pinoli to be an otherwise credible and knowledgeable witness, the court "was not persuaded by Pinoli's testimony alone[,]" that Mendocino Railway had provided passenger service to residents along the route between Fort Bragg and Willits. Citing the best evidence rule, the court indicated that Pinoli failed to provide "written documentation in the form of ticket receipts, ledgers evidencing income, contracts with Mendocino Transit Authority, and contracts for freight transportation."

The court further concluded that Mendocino Railway failed to meet the statutory requirements of eminent domain. The court found the acquisition of the 20-acre site would "enhance the operations" of Mendocino Railway's "excursion service" which generated 90% of its revenue. The court stated it could "easily find" that Mendocino Railway's "primary objective" was to

11

"obtain the property to serve the excursion service." As such, the court concluded Mendocino Railway "cannot exercise the power of eminent domain to carry on its private business activities." The court further noted that "[n]o explanation was offered to distinguish the private operations from the 'proposed' freight and passenger enhancements."

The court determined Mendocino Railway's proposed use of the property "conflicts with the statutory requirements of public use and least private injury." Of particular concern were the "seven months of internal" emails, reflecting that the "original conception" of the project included a campground and recreational vehicle park, as well as a train station. The court was dubious of the 2022 site plan, which was not prepared until 18 months after Mendocino Railway filed the eminent domain action. The court noted the site plan "is considerably different from the original conceptual drawing." Additionally, the court found there was "no evidence" of an "actual plan" for development of or funding for the project, which included: (1) development of maintenance and depot facilities on the Willits end; and (2) creation of a transload facility. The court "questione[d] the credibility of the late hour evidence of a site drawing[,] [p]articularly . . . when a transload facility was added" even though Mendocino Railway was aware that "freight transportation could not happen until 'Tunnel No. 1' was available." Additionally, "[n]o evidence was presented to establish whether or when the tunnel would be available for use."

Finally, the court also questioned the credibility of Pinoli's testimony, given "the initial plan prepared at the time the complaint was filed included a campground." The court opined that the revised site plan, which eliminated the initial concept, was done "in preparation for trial" and "done presumably to satisfy the requirements of the statute." Also "lacking" was

12

"an analysis . . . as to the impact the maintenance and transload facility would have on the residents (including Meyer) living directly adjacent to the proposed 20 acre site." The court found "Pinoli's testimony that there would be no real impact on the residents simply insufficient." Without such information, the court was "unable to determine if the project would impose a greater injury to the residents." Accordingly, the court determined Mendocino Railway "failed to meet its burden of establishing that its attempt to acquire Meyer's property through eminent domain is supported by constitutional and statutory powers."

## D. Mendocino Railway's Motion to Reopen Trial

Prior to the entry of judgment, Mendocino Railway moved to reopen the trial to introduce a newly issued decision from the RRB.[3] In its May 2, 2023 determination, the RRB determined that Mendocino Railway became a railroad "employer" obligated to pay into the federal railroad retirement fund as of January 1, 2022, when it assumed "freight maintenance and operations authority from its affiliate [SNR]" and "took over direct responsibility for fulfilling its common carrier obligations, as well as conducting transload services from [SNR]." The RRB reported that an attorney representing Mendocino Railway indicated that Mendocino Railway "has been a common carrier subject to [STB] jurisdiction since 2004, but it did not take full responsibility for its carrier obligations until January 2022." The RRB clarified: "Prior to the 2004 acquisition, the entity operating the rail line was

_____

[3] On October 1, 2024, Mendocino Railway filed a supplemental request for judicial notice regarding the May 2, 2023 determination by the RRB that we deferred pending resolution of this appeal; we now deny this request on the grounds that the document requested for notice is irrelevant to our resolution of this appeal. For the same reasons, we deny Mendocino Railway's original request for judicial notice filed on September 30, 2024.

13

also a covered employer . . . In 2006, the [RRB] found that Mendocino [Railway] was not an employer . . . because it was not operating in interstate commerce . . . In fact, until January 1, 2022 Mendocino [Railway] was meeting its common carrier obligations through the affiliate arrangement" with SNR.

The court denied the motion.

## DISCUSSION

Mendocino Railway asserts that reversal is required because it "abundantly established that it is—both under the applicable law and facts—a common-carrier public utility railroad entitled to exercise eminent domain" to acquire Meyer's property.

### A. Role of the Trial Court, Standard of Review, and Burden of Proof

In eminent domain actions, all issues except the sole issue relating to compensation are to be tried by the court; the court is to consider all issues of law and mixed issues of law and fact. (Cal. Const., art. I, § 19; *City of Fremont v. Fisher* (2008) 160 Cal.App.4th 666, 678.)

"Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its

14

determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

We conclude the question before us is predominately a legal one because it involves a critical consideration, in a factual context, of the legal requirements for establishing public utility status and satisfaction of the eminent domain law. (See *Crocker National Bank v. City and County of San Francisco*, *supra*, 49 Cal.3d at p. 888; see also *City of Perris v. Stamper* (2016) 1 Cal.5th 576, 594 ["Such questions belong to the trial court even when answering them may require the court to examine factual circumstances— i.e., when the legal question is really a " 'mixed issue[ ] of law and fact where the legal issues predominate' "].)

As the proponent of the eminent domain action, Mendocino Railway had the burden of proving at trial that it qualifies as a public utility entitled to take Meyer's property and that it has satisfied the statutory requirements of the eminent domain law. (See *San Bernardino County Flood Control Dist. v. Grabowski* (1988) 205 Cal.App.3d 885, 898.) Generally, the applicable standard of proof in civil cases is the preponderance of the evidence standard, which means showing the existence of the fact in dispute "is 'more likely than not.' " (*Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1093; Evid. Code, § 115.) Having found no authority warranting a deviation from the generally applicable standard of proof, we conclude Mendocino Railway had the burden of presenting sufficient evidence to prove it is more likely than not a common carrier public utility and that it satisfied the statutory requirements for eminent domain. (See *Robinson v. Superior Court* (2023) 88 Cal.App.5th 1144, 1161 (*Robinson*) [preponderance of evidence standard applicable in eminent domain action].)

## B. General Principles of Eminent Domain

"Under the federal and state Constitutions, private property cannot be 'taken' for public use without the payment of 'just compensation.' (U.S. Const., 5th Amend.; Cal. Const., art. I, § 19, subd. (a).) 'The Fifth Amendment's takings clause, made applicable to the states through the Fourteenth Amendment, does not prohibit the taking of private property.' " (*Lafayette Bollinger Development LLC v. Town of Moraga* (2023) 93 Cal.App.5th 752, 776, fn. omitted.)[4] Rather, it places two conditions—a public use and payment of just compensation—on the exercise of the power. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 19; *City of Oakland v. Oakland Raiders* (1982) 32 Cal.3d 60, 64.) "When properly exercised, that power affords an orderly compromise between the public good and the protection and indemnification of private citizens whose property is taken to advance that good." (*City of Oakland v. Oakland Raiders*, at p. 64.)

The instant appeal is concerned with the first condition—whether the taking of Meyer's property is for public use. As the trial court determined Mendocino Railway did not satisfy this initial condition, the issue of just compensation was not reached. There appears to be no dispute among the parties that Meyer would be entitled to payment of just compensation in the event Mendocino Railway is able to establish it has authority to take the property and that the proposed taking is for public use. The amount and type of such just compensation would be considered in a separate proceeding. (See, e.g., *San Diego Metropolitan Transit Development Bd. v. Price Co.* (1995) 37 Cal.App.4th 1541, 1545.)

---

[4] Generally, the federal and California constitutional provisions are construed congruently. (*Jackpot Harvesting Co., Inc. v. Superior Court* (2018) 26 Cal.App.5th 125, 155, fn. 11.)

## C. Authority to Take Private Property

The power of eminent domain may be exercised "*only by a person authorized by statute* to exercise the power of eminent domain to acquire such property for that use." (Code Civ. Proc., § 1240.020, italics added.) The Law Revision Commission's comment to Code of Civil Procedure section 1240.020 states that " '[p]rivately owned public utilities may condemn for utility purposes . . . .' " (*Robinson, supra,* 88 Cal.App.5th at p. 1159.)

Public Utilities Code section 610 states: "This article applies only to a corporation or person that is a public utility." The Law Revision Commission's comment to this section makes clear that the right of eminent domain extends only to public utilities as defined in Public Utilities Code section 216 and not to entities that are not subject to regulation and rate control. (Cal. Law. Revision Com. com., 57 Pt. 2 West's Ann. Pub. Util. Code (2025 ed.) foll. § 610, p. 266.)

The definition of "public utility" includes "every common carrier . . . where the service is performed for, or the commodity is delivered to, the public or any portion thereof." (Pub. Util. Code, § 216, subd. (a).) For purposes of the Public Utilities Code, a "common carrier" means "every person and corporation providing transportation for compensation to or for the public *or any portion* thereof," including "[e]very railroad corporation". (Pub. Util. Code, § 211, subd. (a), italics added.)[5]

---

[5] A "railroad corporation" is defined as "every corporation or person owning, controlling, operating, or managing any railroad for compensation within this State." (Pub. Util. Code, § 230.) A "railroad" includes "every commercial, interurban, and other railway . . . owned, controlled, operated, or managed for public use in the transportation of persons or property." (Pub. Util. Code, § 229.)

17

Article XII, section 3 of the California Constitution provides the following definition of public utilities: "Private corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property . . . *directly or indirectly* to or for the public, and common carriers, are public utilities subject to control by the Legislature." (Italics added.)

The Public Utilities Code similarly provides that "[w]hen any person or corporation *performs any service for, or delivers any commodity* to, any person, private corporation, municipality, or other political subdivision of the state, that in turn *either directly or indirectly, mediately or immediately, performs that service for, or delivers that commodity to, the public or any portion thereof*, that person or corporation *is a public utility* subject to the jurisdiction, control, and regulation of the commission and the provisions of this part." (Pub. Util. Code, § 216, subd. (c), italics added.) " 'Public or any portion thereof' means the public generally, or any limited portion of the public, including a person, private corporation, municipality, or other political subdivision of the State, for which the service is performed or to which the commodity is delivered." (Pub. Util. Code, § 207.)

These "provisions make clear that a utility that has dedicated its property to public use is a public utility even though it may serve only one or a few customers or a utility that in turn serves the public. [Citations.] Subdivision (c) of [Public Utilities Code] section 216 also allays any doubt that a public utility that has been serving the public directly remains such even though it turns its distributing system over to a publicly or privately owned utility and thereafter limits its own business to supplying the utility that directly serves the public." (*Richfield Oil Corp. v. Public Utilities Commission* (1960) 54 Cal.2d 419, 431 (*Richfield*).)

18

Under these statutes, the relevant question is not the number and type of customers but whether an entity has dedicated its services for public use. (*Richfield, supra*, 54 Cal.2d at pp. 430–431; see *Unocal California Pipeline Co. v. Conway* (1994) 23 Cal.App.4th 331, 333, 334–335 (*Unocal*) [pipeline corporation could be public utility with power of eminent domain even if sole customer is parent company].) " 'The test . . . is whether the public has a legal right to the use, which cannot be gainsaid, or denied, or withdrawn at the pleasure of the owner." (*Story v. Richardson* (1921) 186 Cal. 162, 167.) In other words, " '[t]he essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefiniteness or unrestricted quality that gives it its public character.' " (*Ibid.*)[6]

Here, the trial court found Mendocino Railway is not a true public utility because it is primarily an excursion service, providing limited, if any, commuter and freight services. However, it is long been the rule that where the public nature of the business activity is established, it matters not that sales are to only a few customers or that the entity only indirectly serves the public by providing services through its affiliated entities: "[A] utility that

---

[6] At oral argument, Meyer's counsel focused on Pinoli's testimony that Mendocino Railway had not performed common carrier public utility services from the time of its purchase of CWR in 2004 until January 1, 2022. Pinoli's testimony, however, must be taken in context. Although he admitted Mendocino Railway had not initially performed passenger and freight services itself, it provided such services through its affiliated entities. Moreover, established case law makes clear that an entity's public utility status is dependent on whether its property and/or services are *offered* to the public. (See *Richfield, supra*, 54 Cal.2d at p. 431; see also *Commercial Communications, Inc. v. Public Utilities Com., supra*, 50 Cal.2d at p. 523.) Meyer's counsel also attempted, without applicable authority, to quantify the *amount* of public use as being determinative of an entity's common carrier public utility status. Again, this is not the test.

19

has dedicated its property to public use is a public utility even though it may serve only one or a few customers or a utility that in turn serves the public." (*Richfield, supra*, 54 Cal.2d at p. 431; see also *Commercial Communications, Inc. v. Public Utilities Com.* (1958) 50 Cal.2d 512, 523 ["The fact that only a restricted portion thereof is eligible to apply for it is not determinative. It is offered to all of the public who may be eligible to apply for it. Dedication to a portion of the public will suffice."].)

The trial court further determined that Mendocino Railway is not a public utility because it has never actually provided commuter and freight services itself but has relied on subsidiaries. Not only is there no authority cited supporting this proposition, but it is also contrary to established law. Both the California Constitution and the Public Utilities Code recognize a public utility may "either directly or indirectly" provide services to the public. (See Cal. Const., art. XII, § 3; Pub. Util. Code, § 216, subd. (c).) Moreover, our Supreme Court long ago recognized that a public utility retains its status even if it does not directly serve the public. (*Richfield, supra*, 54 Cal.2d at p. 431.)

The trial court also found Mendocino Railway's failure to provide documentary evidence—contracts with the affiliated companies, ledgers, receipts, payments, etc.—substantiating its commuter and freight services, as a basis for determining it was not a public utility. However, we have found no authority supporting this position.[7] In any event, Mendocino Railway provided its published tariffs regarding passenger and freight fares from 1993 to 2021. The tariffs demonstrate, in exhaustive detail, the listed

---

[7] The best evidence rule precludes oral testimony to prove the contents of a writing. (Evid. Code, § 1523.) This rule, also known as the secondary evidence rule, has no application in this case. (See *Doe v. Regents of California* (2018) 28 Cal.App.5th 44, 57.)

20

services, routes, and fares associated with Mendocino Railway's passenger and freight services available to the public. Although the tariffs do not prove that Mendocino Railway actually rendered passenger or freight services, such proof was not required. Rather, what is required is a showing of the public's unconditional right to use the CWR. (See *Story v. Richardson*, *supra*, 186 Cal. at p. 167.)

Based on the applicable law, we conclude Mendocino Railway established by a preponderance of the evidence that it is a common carrier public utility. The administrative decisions cited by the trial court are inapposite and do not compel a contrary conclusion.

For example, the 2006 RRB determination was limited to Mendocino Railway's status as an "employer[] under the Railroad Retirement Act . . . and the Railroad Unemployment Insurance Act." Nothing in this decision, however, purports to address Mendocino Railway's common carrier status for purposes of the Public Utilities Code.

Similarly, inapposite is the *January 21, 1998 CPUC Decision*. That decision pertained to an application of CWRR, Mendocino Railway's predecessor, to deregulate its excursion service and reduce its commuter services to three days a week in the winter months. Nothing in that decision purported to repudiate CWRR's, let alone Mendocino Railway's, status as a public utility. Quite the contrary. The CPUC acknowledged in its decision that the CWRR provided more than just excursions, stating that "CWRR transports passengers and freight between Fort Bragg and Willits," as well. (*January 21, 1998 CPUC Decision*, *supra*, 78 Cal. P.U.C. 2d 292 at *2.) The CPUC further noted CWRR provided one round trip daily service, 362 days a year from Fort Bragg and Willits, "charg[ing] commutation fares and special intermediate point round-trip-ticket fares." (*Ibid.*) In granting the

21

deregulation application, the CPUC determined: "In *providing its excursion service*, CWRR is not functioning as a public utility." (*Id.* at *8, italics added.) The CPUC further ordered the proceeding to "remain open to consider CWRR's request to reduce its commuter service. (*Id.* at *11.) When read in context, the decision stands for the unremarkable position that excursion services are not a public utility function—an issue that is not disputed in this case. (*Cf. City of St. Helena v. Public Utilities Com.* (2004) 119 Cal.App.4th 793, 802–803 [train providing purely sightseeing not a public utility], disapproved on another point in *Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1140.)

In addition to overemphasizing the importance of the *January 21, 1998 CPUC Decision*, the trial court also ignored two subsequent CPUC decisions.[8] The first is the *May 21, 1998 CPUC Decision* concerning CWRR's motion to withdraw its request to reduce commuter service. The decision reiterates that CWRR "transports passengers and freight between Fort Bragg and Willits," and "serves a few communities" in between. (*May 21, 1998 CPUC Decision*, *supra*, Cal. P.U.C. Dec. No. 98-05-054 at *1–*2.) The decision makes clear that the railroad's "passenger service" is "[i]n addition" to the excursion service. (*Ibid.*) The CPUC ultimately granted CWRR's motion to withdraw its request to reduce commuter service, because "[g]ranting . . . CWRR's motion" was "in the best interest of passengers which use CWRR's service." (*Id.* at *2–*3.)

Additionally, the *August 6, 1998 CPUC Decision* addressing stock issuance similarly affirms CWRR's common carrier public utility status. As

---

[8] The CPUC staff attorney letter cited by the trial court similarly relies on the *January 21, 1998 CPUC Decision*, without addressing the subsequent CPUC decisions.

the decision notes, "[b]efore a public utility may issue stocks and stock certificates, it must obtain an order from this Commission authorizing the issue . . . PU Code Section 818."[9] (*August 6, 1998 CPUC Decision*, *supra*, 81 Cal. P.U.C. 2d 514 at \*10–\*11.) CWRR made the application as a public utility, and the Commission accepted and adjudicated the application based on CWRR's status as a public utility. (*Id.* at \*12.) In its "findings of fact," the CPUC specifically found that CWRR "is a common carrier railroad engaged in interstate commerce," and "operates railroad passenger and freight services between Fort Bragg and Willits, California." (*Id.* at \*17.) In its "conclusions of law," the CPUC held: "[CWRR] is a public utility within the meaning of Section 216(a) of the PU Code." In footnote 7 of its decision, the CPUC also held that "[CWRR] is a common carrier, see PU Code Section 211, and is therefore a public utility under California law. PU Code 216(a)." (*Id.* at \*10, fn. 7.)

The fact that Mendocino Railway's predecessor petitioned the CPUC to reduce its commuter service, that the CPUC indicated it would keep the request open after it deregulated the excursion service, and that CPUC subsequently granted the predecessor's petition to withdraw its request to reduce commuter service is indicative of public utility status, which CWRR and the CPUC assumed it had. (See *Van Hoosear v. Railroad Com. of California* (1920) 184 Cal. 553, 554–555 [water supplier's status as public utility could be inferred by supplier's request to Railroad Commission to discontinue service].) Similarly, the fact that Mendocino Railway's

_____

[9]Public Utilities Code section 818 provides, in pertinent part, as follows: "No public utility may issue stocks and stock certificates . . . unless, in addition to the other requirements of law it shall first have secured from the commission an order authorizing the issue . . . ."

predecessor sought and received permission to issue stock as required by Public Utilities Code section 818 is indicative of its public utility status. (See *Traber v. Railroad Com. of California* (1920) 183 Cal. 304, 307–308 [corporation organized under statute relating to public utilities indicative that service provided was a public utility]; see *Palermo Land & Water Co. v. Railroad Com. of California* (1916) 173 Cal. 380, 384 [submission to have rates fixed by public authority implies service is a public utility].)

We conclude that when viewing the evidence presented through the appropriate legal standards, Mendocino Railway met is burden of proving it is more likely than not a common carrier public utility.[10]

## D. Legal Requirements for a Taking

Having concluded, Mendocino Railway has satisfied its burden of proving that it is more likely than not a common carrier public utility, we next address whether it has satisfied the statutory requirements for eminent domain. That is, whether it has established by a preponderance of the evidence that "(a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project." (Code Civ. Proc., § 1240.030; *San Bernardino County Flood Control Dist. v. Grabowski, supra*, 205 Cal.App.3d at p. 898.)

---

[10] We note that prior to oral argument, counsel for Mendocino Railway submitted a decision from the STB from September 26, 2025, which issued a declaratory order confirming Mendocino Railway's status as a Class III rail carrier subject to its jurisdiction. (*Mendocino Railway – Petition for Declaratory Order*, Docket No. FD 36868, *1 (STB Sept. 26, 2025).) However, this decision is not relevant to our determination that Mendocino Railway has met its burden of establishing its common carrier public utility status under state law.

*Public Interest*

As discussed, the power of eminent domain may be exercised to acquire property only for a public use. (U.S. Const., 5th & 14th Amends.; Cal. Const. art I § 19.) "It is for the Legislature to determine what shall be deemed a public use for the purposes of eminent domain, and its judgment is binding unless there is no ' "possibility the legislation may be for the welfare of the public." ' " (*People ex rel. Department of Public Works v. Superior Court of Merced County* (1968) 68 Cal.2d 206, 210.) "Where the Legislature provides by statute that a use, purpose, object, or function is one for which the power of eminent domain may be exercised, such action is deemed to be a declaration by the Legislature that such use, purpose, object, or function is a public use." (Code Civ. Proc., §1240.010.)

Public Utilities Code section 611 provides that a railroad corporation, such as Mendocino Railway, "may condemn any property necessary for the construction and maintenance of its railroad." As stated, Mendocino Railway seeks to acquire the property for the "construction and maintenance of rail facilities" related to Mendocino Railway's "ongoing and future freight and passenger rail operations." As the proposed transloading facilities and related rail improvements are incident to the operation and maintenance of the railroad, the proposed taking is deemed a public use. (Code Civ. Proc., § 1240.010; Pub. Util. Code, § 611.) Nevertheless, this legislative declaration does not preclude Meyer from demonstrating that, as a matter of fact, the use sought to be served is a private one. (See Code Civ. Proc., §§ 1250.350, 1250.360; *Los Angeles County v. Anthony* (1964) 224 Cal.App.2d 103, 105.) The burden of proof is on Meyer to show the purported use is not the intended use. (*People ex. rel. Dept. of Public Works v. Garden Grove Farms* (1965) 231 Cal.App.2d 666, 671.)

25

The trial court implicitly found Meyer had met his burden of proof, ruling that because "the income generated from the Skunk Train excursion service is 90% of [Mendocino Railway]'s revenue" it could "easily find that [Mendocino Railway]'s primary objective is to obtain the property to serve the excursion service." Based on this finding, the court concluded Mendocino Railway "cannot exercise the power of eminent domain to carry on its private business activities." Although the court began this section by "[a]ssuming" Mendocino Railway "has public utility status," for the purpose of its eminent domain analysis, this finding is based on the same rationale for its determination that Mendocino Railway is not a public utility—i.e. that any public use is incidental to its private activities.

This interpretation is contrary to established law. It is the character of the use, not its extent, which determines whether it is public. (*Laguna Drainage Dist. v. Charles Martin Co.* (1904) 144 Cal. 209, 217–218; *People ex rel. Department of Public Works v. Lagiss* (1963) 223 Cal.App.2d 23, 38.) In other words, it is not necessary that a significant portion of the community enjoy the use. (*Laguna Drainage Dist. v. Charles Martin Co.*, at pp. 217–218.) Rather, the law simply requires that all citizens in a given community, who are capable of enjoying the use, have an equal right to do so. (*San Joaquin & Kings River Canal & Irrigation Co. v. Stevenson* (1912) 164 Cal. 221, 229.) The intended use must be the intended object (*Lorenz v. Jacob* (1883) 63 Cal. 73, 74), but an incidental private benefit does not disqualify a use as a public use (*Redevelopment Agency v. Rados Bros.* (2001) 95 Cal.App.4th 309, 315.) Stated differently, the primary purpose cannot be to promote a private enterprise, or to accomplish a purpose the primary nature of which is not public under the pretext that it is. (See, e.g. *County of San Mateo v. Coburn* (1900) 130 Cal. 631, 634 [where "it is clear that it is for a

26

private purpose, the legislative declaration will be of no avail"]; *San Francisco v. Ross* (1955) 44 Cal.2d 52, 59 ["percentage area to be used for other commercial activity is small enough to be merely an incident to the parking activity and not in itself enough to invalidate the whole plan, nevertheless it aids in characterizing the whole operation as a private one for private gain"].)

At trial, Meyer sought to prove the real purpose of Mendocino Railway's acquisition of his property was for private purposes—expansion of its excursion services—without any relation to the expansion of its commuter and freight services. In support of this position, Meyer submitted Mendocino Railway's initial conceptual drawing for the property, which included a station/store, campground, and a long-term recreational vehicle park. That conceptual drawing was ultimately abandoned in the subsequent June 2022 site plan, which depicts maintenance/ repair facilities, a yard, vehicle parking, a rail transloading facility, depot offices, a platform, and a natural habitat preserve.

The trial court gave little weight to the June 2022 site plan because it was not prepared until 18 months after the eminent domain action was filed and it was "considerably different from the original conceptual drawing." The court also found there was "no evidence of an actual plan for development or funding of the project", which had the effect of leaving Meyer in the dark in terms of what is being planned for his property.

Assuming, but not holding, that the "late hour evidence of a site plan" was somewhat dubious, and the project description is somewhat general in nature, it does not follow that the property sought to be condemned may not be put to a public use. Beyond an outdated conceptual drawing and mere speculation about Mendocino Railway's intentions, there is nothing in the

record to force the conclusion that the principal, if not the predominant, use of the property sought to be acquired will be private and not public. Nor is there anything to require us to conclude that because Mendocino Railway has historically derived 90% of its income from its private excursion services that the property sought is merely incidental to the principal public use and is in fact private. (See, e.g., *Stratford Irr. Dist. v. Empire Water Co.* (1943) 58 Cal.App.2d 616, 621–622.) Mendocino Railway's stated intention is to acquire the property to assist in its commuter and freight services, by improving its facilities. Under such circumstances, the finding of public use has sufficient support in the declaration of the Legislature (see Pub. Util. Code, § 611), which is not overcome by the fact that the acquisition may also incidentally benefit Mendocino Railway's private business activities. Should the proposed development violate any provisions of the law or of the Constitution by furthering a purely private endeavor—i.e., campgrounds, retail spaces, etc.—Meyer's remedy is in an action attacking that future development and not in in an attempt to defeat a proper acquisition of property for a valid purpose. (See *County of Los Angeles v. Anthony*, *supra*, 224 Cal.App.2d at p. 107 [acquisition of land for motion picture and television museum was for public good, if contract for construction, operation and maintenance of a building violated law or Constitution, remedy was an action challenging the development not the acquisition of land].)

*Location*

"Proper location is based on two factors: public good and private injury. Accordingly, the condemnor's choice is correct or proper unless another site would involve an equal or greater public good and a lesser private injury. A lesser public good can never be counter-balanced by a lesser private injury to equal a more proper location. [Citation.] Nor can equal public good and

28

equal private injury combine to make the condemnor's choice an improper location." (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 470–471, fn. omitted.)

This limitation essentially involves a comparison of two or more sites. (See *San Diego Gas & Elec. Co. v. Lux Land Co.* (1961) 194 Cal.App.2d 472, 477–478.) The evidence at trial reflects Mendocino undertook an extensive search, investigation, and analysis of several potentially suitable locations for the project. In its search, Mendocino Railway considered various factors and site characteristics required for its project, including, without limitation, size, shape, location, and topography. Generally, the site needs to be relatively level, large enough to accommodate the construction of rail facilities suitable for ongoing and future operations, and located along Mendocino Railway's existing rail line.

After considering six other potential sites, Mendocino Railway determined that the subject property was the only site that met all key site requirements for the project. The subject property is a relatively level parcel of approximately 20 acres located along Mendocino Railway's main rail line near Willits, with good accessibility to a highway. Moreover, the subject property is undeveloped and the property owner, Meyer, at least initially, indicated a willingness to sell.

The trial court nevertheless implicitly concluded this uncontradicted evidence failed because Mendocino Railway presented no analysis regarding the impact the project would have on the residents living directly adjacent to the property. It was certainly well within the court's province to disregard Pinoli's testimony that there would be no real impact on the residents. (See *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 396.) We do not purport to second-guess this decision or reweigh the

29

evidence. (*Washington Mutual Bank v. Blechman* (2007) 157 Cal.App.4th 662, 670.) But whether the facts, when construed most favorably in Meyer's favor, are legally sufficient to establish an unlawful taking, is a question of law we review de novo. (See *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188 [whether facts, when construed most favorably to prevailing party are legally sufficient to constitute civil harassment reviewed de novo]; *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890 [reviewing court independently examines whether facts come within 1st Amend.]; *Smith v. Selma Comm. Hosp.* (2008) 164 Cal.App.4th 1478, 1515 [existence or nonexistence of substantial evidence supporting a jury instruction is question of law].)

Here, the record reflects Mendocino Railway compared numerous locations and concluded Meyer's property was the most suitable. In other words, the selection of the property was proper because there was no other site with an equal or greater public good. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.*, *supra*, 121 Cal.App.4th at pp. 470–471, fn. omitted.) The failure to prove the location of the project was most compatible to the least private injury was not fatal to an otherwise lawful taking. (See *Pasadena v. Stimson* (1891) 91 Cal. 238, 254–255 (*Stimson*) [failure to prove location of sewer was most compatible with greatest public good and least private injury not a basis for nonsuit].) To be sure, the construction and maintenance of railroad-related facilities could impact neighboring property owners. However, without at least *some* proof the location is unnecessarily injurious, no location could ever be approved. (*Cf. Stimson*, *supra*, 91 Cal. at p. 255–256 [requiring clear and convincing evidence to challenge sewer location proposed by public entity].) Here, other than mere disbelief in Pinoli's testimony that the project would have no impacts, no countervailing evidence was presented.

30

We conclude, notwithstanding the absence of an impacts analysis, the facts adduced at trial establish that the project is planned and located in the manner most compatible with the greatest public good and least private injury.

*Necessity of Property*

Finally, "[t]he property sought to be acquired" must be "necessary for the project." (Code Civ. Proc., § 1240.030, subd. (c).) "This aspect of necessity includes the suitability and usefulness of the property for the public use. [(See *City of Hawthorne v. Peebles* [(1959)] 166 Cal.App.2d 758, 763 ("necessity does not signify impossibility of constructing the improvement . . . without taking the land in question, but merely requires that the land be reasonably suitable and useful for the improvement") . . . Thus, evidence on the aspect of necessity covered by subdivision (c) is limited to evidence showing whether the particular property will be suitable and desirable for the construction and use of the proposed public project." (Cal. Law. Revision Com. com., 19 West's Ann. Code Civ. Proc. (2025 ed.) foll. § 1240.030, p. 322.)

As discussed in the preceding section, the trial testimony established that there are several key site requirements for construction of the project, including that the property be approximately 20 acres in size, relatively level, located along Mendocino's rail line, near the City of Willits, and adjacent to a highway. Meyer's property is the only property identified by Mendocino Railway as having these features and being suitable for the project.

Accordingly, we conclude Mendocino Railway met its burden of establishing by a preponderance of the evidence that it has complied with the statutory requirements for eminent domain.

31

## DISPOSITION

The judgment in favor of Meyer and the related attorney fees award are reversed. The matter is remanded for further proceedings regarding the amount of compensation to be paid to Meyer for the taking of his property. Mendocino Railway is entitled to its costs on appeal.

_____

Langhorne Wilson, J.

WE CONCUR:

_____

Humes, P. J.

_____

Smiley, J.

*Mendocino Railway v. Meyer*/A168497, A168959

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MENDOCINO RAILWAY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>JOHN MEYER,<br><br>      Defendant and Respondent. | A168497, A168959<br><br>(Mendocino County<br>Super. Ct. No. SCUK-CVED-<br>2020-74939)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION AND<br>DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT[*]:

The opinion in the above-entitled matter, filed on December 9, 2025, was not certified for publication in the Official Reports.  After this court's review of appellant Mendocino Railway's request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Respondent's petition for rehearing is denied.


Date: _____          _____ P.J.
_____

[*] Humes, P.J., Langhorne Wilson, J., and Smiley J. participated in the decision.

1

*__Mendocino Railway v. Meyer__* **(A168497, A168959)**

Trial Court:      Mendocino County Superior Court

Trial Judge:      Hon. Janine Nadel

Counsel:

California Eminent Domain Law Group, Glenn Lawrence Block;
Pierson Ferdinand, Paul James Beard, II, for Plaintiff and Appellant.

Mannon, King, Johnson & Wipf, Stephen Francis Johnson, for
Defendant and Respondent.